501 So.2d 800 (1986)
Frank R. POIRRIER
v.
CAJUN INSULATION, INC., a/k/a the Cajun Company, Louisiana Power and Light Company, et al.
No. CA-4854.
Court of Appeal of Louisiana, Fourth Circuit.
December 22, 1986.
Writs Denied February 20, 1987.
*801 Raymond A. Milly, Lawrence A. Milly, Metairie, for plaintiff-appellant-appellee Frank R. Poirrier.
Blue, Williams, Buckley, George R. Blue, Madison C. Moseley, Thomas G. Buck, Metairie, for defendant-appellee The Cajun Co.
Donald T. Giglio, New Orleans, for defendant-appellee Pacific Employers Insurance Co.
David M. Packard, Metairie, for appellant-intervenor Fidelity & Casualty Co. of N.Y.
*802 Lemle, Kelleher, Kohlmeyer, Dennery, Henley, Moss & Frilot, Paul B. Deal, Vincent Paciera, Jr., New Orleans, for appellees River Parish Maintenance, Kerry Ruiz and Employees Casualty Co.
Before GULOTTA, SCHOTT, BYRNES, LOBRANO and ARMSTRONG, JJ.
GULOTTA, Judge.
In this suit for damages resulting from a work-related injury, plaintiff, tortfeasor Cajun Insulation, Inc., and The Fidelity and Casualty Company of New York, the intervening worker's compensation insurer, appeal from a $450,000.00 jury award. Although we otherwise affirm the judgment in part, we recast that portion regarding reimbursement of benefits paid by the worker's compensation insurer, and reverse and remand for the limited purpose of determining whether the tortfeasor's primary liability insurance is uncollectible thereby making the excess liability carrier the primary insurer.

BACKGROUND
On March 24, 1983, at Louisiana Power and Light's Nine-Mile Point plant in Westwego, Louisiana, Frank R. Poirrier, a boilermaker employed by Lou-Con, Inc., an independent contractor, was injured in a fall from a ladder in the course of his employment.
Poirrier filed suit against the following defendants: Louisiana Power & Light Company [LP & L] (the owner of the premises); Cajun Insulation, Inc., a/k/a the Cajun Company [Cajun] (an independent contractor responsible for providing scaffolding at the work site); Northwest Insurance Company [Northwest] (Cajun's primary liability carrier); Pacific Employers Insurance Company [Pacific] (Cajun's excess liability carrier); Lou-Con, Inc. [Lou-Con] (plaintiff's employer); The Fidelity and Casualty Company of New York [Fidelity] (Lou-Con's worker's compensation carrier); River Parish Maintenance, Inc. [RPM]; and Kerry Ruiz (an employee of RPM).[1]
Fidelity intervened seeking reimbursement for worker's compensation benefits and medical benefits paid to plaintiff. Fidelity and Lou-Con also filed third party demands against Cajun, LP & L and RPM for indemnification or contribution.
Following a trial on the merits, the jury exonerated RPM and Kerry Ruiz from fault, concluded that Cajun was 100% negligent, and awarded plaintiff $450,000.00. In a May 16, 1985, judgment in consideration of the jury's verdict, the trial judge dismissed plaintiff's suit against RPM and Kerry Ruiz and decreed that Cajun was liable to plaintiff for the amount awarded.
On June 18, 1985, however, the trial court amended the judgment to provide that Cajun and its liability insurer Northwest were liable in solido to plaintiff. Moreover, on Fidelity's claim in intervention, the trial judge cast Cajun, Northwest and Poirrier in judgment in solido to Fidelity for the full amount of worker's compensation and medical benefits paid by the intervenor to plaintiff. Poirrier's claims against RPM, Kerry Ruiz, and Cajun's excess insurer Pacific were dismissed. It is from this judgment that the parties have appealed.

LIABILITY
Cajun contends that plaintiff failed to establish Cajun's negligence or that an accident actually occurred. Evidence on these questions was conflicting.
Plaintiff testified that before resuming work on the afternoon of the accident on March 24, 1983, he observed two men from a Cajun Insulation truck install an aluminum scaffolding ladder to provide Poirrier and his co-workers access into the boiler. According to Poirrier, the Cajun employees secured the ladder with tire wire which he described as being the size of a paper clip rather than thicker wire. In the course of *803 his work plaintiff used the ladder on several occasions. On the accident date, when exiting the boiler and as Poirrier placed his weight on the ladder, the wire broke causing plaintiff to fall approximately five feet to the ground.
Theodore Bukaske, plaintiff's general foreman at the time of the accident, testified that after observing plaintiff brushing himself off, Poirrier told him that he had slipped and fallen from a ladder. Although Bukaske admitted seeing the ladder, he could not recall its condition. Bukaske further stated that although Cajun was responsible for the scaffolding on March 23 and March 24, 1983, anyone working on the job site could have installed the ladder on the boiler.
Irving Sears, Lou-Con's boiler room foreman, testified that although Cajun was responsible for the erection of scaffolding at the time of the accident, he did not see Cajun personnel putting up the ladder. Furthermore, Sears stated that even though the time sheet for March 24 gave Poirrier credit for a full eight hour day, it did not accurately reflect that plaintiff had actually worked on that particular job for the full eight hours.
Michael Bourgeois, plaintiff's co-worker, testified that on the day of the accident he was working inside the boiler with Louis Castillo and that Poirrier was working outside the boiler. This witness stated that he entered the boiler using a steel ladder, as distinguished from scaffolding. According to Bourgeois, the wire securing the ladder, was thicker than the wire described by Poirrier. He also related that although he had used the ladder after Poirrier had told him about his accident, he did not notice anything unusual except that it was not tied in the customary manner. In addition, Bourgeois stated that the normal procedure when working on a boiler is to use a scaffold.
Louis Castillo testified that he was working inside the boiler but did not recall if Poirrier had entered or exited the boiler during the day. Castillo, like Bourgeois indicated that the ladder was secured by heavier wire. Although this witness stated that the ladder appeared to be unstable, he recalled that it did not seem dangerous when he used the ladder several times during the day.
Paul Abshire, Cajun's foreman at the plant, testified that Cajun had been responsible for all scaffolding at the installation since March 14, 1983. However, Abshire related that although the March 23 and 24 work orders listed fifteen 6 foot ladders, there was no mention of tire wire being used as described by plaintiff. Furthermore, admitting that he had stated in an earlier deposition that Cajun could have installed a ladder without recording it, Abshire did say that there would have been some verbal acknowledgement. In addition, he also stated that none of the jobs listed for Cajun on March 22 and March 23 had anything to do with the boiler entrance where plaintiff was injured. Abshire, corroborated by a fellow employee, Peter Ordyne, also testified that he had talked to Kerry Ruiz, an employee of River Parish Maintenance, about Poirrier's fall and Ruiz had told him that he had installed the ladder indicating that Cajun employees had not made the installation but that RPM's employee had done so. Ruiz denied working near the boiler, however, and disputed Abshire and Ordyne's testimony.
Randy Dufour, an LP & L maintenance superintendent, stated that at the time of the accident Cajun was responsible for all scaffolding, including putting ladders on the accesses to the boilers. However, Dufour did admit that his own people might have installed the ladders.
Considering the evidence, we cannot say the jury erred, based on credibility, in accepting Poirrier's testimony and rejecting conflicting evidence. Poirrier's testimony, corroborated in some respects by the other witnesses, provides sufficient evidence that plaintiff fell from a defectively attached ladder as a result of Cajun's breach of a duty at the worksite. Accordingly, we find no error in finding liability on the part of Cajun.

*804 ASSUMPTION OF RISK/CONTRIBUTORY NEGLIGENCE
In the alternative, Cajun contends the jury manifestly erred by failing to find that Poirrier had assumed the risk and/or was contributorily negligent. In support of this contention, Cajun argues that because Poirrier was aware of the condition of the ladder and his employer's policy requiring him to report an unsafe condition or remedy that condition himself, Poirrier was thereby contributorily negligent.
The determination of whether or not plaintiff has assumed a risk is made by subjective inquiry, whereas contributory negligence is determined objectively under the reasonable man standard. See Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971), rehearing denied June 26, 1971.
It is fundamental that, in order to assume a risk, one must knowingly and voluntarily encounter a risk which caused him harm. Plaintiff must understand and appreciate the risk involved and accept the risk as well the inherent possibility of danger because of that risk. Lytell v. Hushfield, 408 So.2d 1344 (La.1982), rehearing denied February 19, 1982. Assumption of risk and contributory negligence are affirmative defenses that must be specially pleaded. LSA-C.C.P. Art. 1005. The burden of proving these defenses is on the defendant. Lytell v. Hushfield, supra.
Although plaintiff testified that the ladder appeared to be shaky, it never crossed his mind that it would break. His testimony is further corroborated by Castillo who also related that the ladder appeared to be unstable, although not dangerous. In addition, plaintiff related that he was aware of the company policy requiring that an unsafe condition be reported or handled by the individual observing that condition. However, he did nothing because he felt that the ladder's condition "never did threaten me in any kind of way" and that a complaint would have been futile because he had been told that "the work had to get done". Despite the fact that plaintiff was aware he was using a ladder that was somewhat shaky, we cannot say the jury erred when it concluded plaintiff was not guilty of assumption of the risk.
We also reject Cajun's contention that Poirrier was contributorily negligent. Considering that Poirrier and his co-workers had used the ladder several times prior to his fall, we cannot say that plaintiff's conduct fell below that of a reasonable man under these circumstances.
Accordingly, the jury had ample basis to conclude that plaintiff had neither assumed the risk nor was contributorily negligent and that Cajun's negligence was 100%.

CAUSATION
Cajun further argues the jury erred in finding that plaintiff's neck, arm and back problems were accident related. In support of its contention, Cajun contends that plaintiff's injuries were caused by an earlier thirty-five foot fall thirteen months prior to the March 24, 1983 accident, and also by a degenerative disc disease. In the alternative, Cajun argues that if plaintiff was injured in the later five foot fall, the jury committed reversible error in holding Cajun liable for all of his problems.
Dr. James A. Kenning, a neurosurgeon, stated in deposition that on a March 30, 1983 visit, plaintiff revealed an intermittent history of neck and right arm pain following a fall of approximately 35 feet in March, 1982, which had largely been resolved until the subsequent fall in 1983. According to Dr. Kenning, Poirrier had a degenerative disease which became exacerberated by the March 24, 1983 fall. Poirrier testified that although he had fallen from a scaffold about a year prior to the LP & L accident any problems with his neck and back resulting from the 1982 fall had been resolved before the 1983 accident. Furthermore, it was not until April 28, 1983 that Poirrier underwent cervical fusion at the C-5-6 level.
*805 Implicit in the award is a jury finding that the accident, subject of this lawsuit, caused or aggravated plaintiff's injuries. The evidence considered, we cannot say the jury erred.

QUANTUM
We likewise reject Cajun's argument that the $450,000.00 award is excessive.
In addition to Dr. Kenning's deposition, the jury had the benefit of the testimony of Dr. Naun Klainer, an orthopedic surgeon, who first saw Poirrier on July 13, 1984, when he complained of neck and back pain. According to Klainer, Poirrier underwent a second anterior cervical fusion of the C-4-5 level on September 11, 1984. Although the fusion was successful, Poirrier continued to complain of pain in the neck, arm, and back, which not only prevents him from sleeping and carrying on activities around the house, but also makes it difficult for him to go up and down ladders and carry heavy weights. According to this expert, Poirrier has a 15-20% disability. After treating plaintiff for approximately one year, it was Klainer's opinion that Poirrier should not return to a job requiring heavy physical activity.
Dr. Lawrence Kavanaugh a general surgeon, who had earlier treated Poirrier in February, 1982 for his first fall, saw plaintiff after the March 24, 1983 accident. At that time, plaintiff was complaining of pain in his shoulders and intermittent numbness in the fingers of his right hand. In May, 1983, Poirrier returned with symptoms of tension and nervousness. Poirrier suffered depression, tension and anxiety requiring hospitalization at DePaul Hospital. In this connection Dr. Robert C. Lancaster, a psychiatrist stated that Poirrier had been depressed and had been drinking excessively.
Dr. Rand Voorhies, a neurosurgeon who first saw Poirrier on January 6, 1984, testified that plaintiff reported extreme pain in the fourth and fifth digits of the right hand, numbness of the entire right arm and pain radiating down to his left leg, all of which made his work intolerable. Dr. Voorhies further stated that Poirrier was seen on January 20, 1984 by a psychiatrist, Dr. Rouchell, who noted that plaintiff suffered from reactive depression to medical problems. On February 26, 1984 Voohries again saw Poirrier and found that although plaintiff's pain was not any better, his state of mind had improved. The witness further testified that Poirrier had no neurologically identifiable cause for his pain and, as a result, he was pessimistic about plaintiff reaching a state of being pain free. However, Voorhies also stated that Poirrier should be able to engage in the same type of work which he performed before the accident, or any other job, except one which would require "him to twist his neck around constantly".
Dr. Donald R. Richardson, a neurosurgeon who first saw Poirrier in September, 1983, evaluated Poirrier as having a 10-15% disability of the cervical spine.
Poirrier testified that prior to the 1983 accident he had enjoyed an active sports life. He now takes anti-depressant medication three times a day, suffers constant pain in his back, has trouble swallowing food, has dryness of the mouth, sleeping difficulties, and a diminished sex drive. Currently he is able to drive a car but has trouble turning his head. Plaintiff has a sixth grade education, can read but cannot write, and has been a boilermaker all of his life. Plaintiff attempted to work after his first surgery, but stopped after four hours because he could not tolerate the pain.
At the time of his accident Poirrier was receiving a foreman's pay which was $17.36 an hour. He earned $36,645.12, in 1982, $17,035.00 in 1983 and $18.32 in 1984. Richard Camus, an actuary stated that at the time of the accident plaintiff was earning approximately $38,125.00. Based on plaintiff's 40 years of age and work expectancy of 24 years, Camus calculated Poirrier's lost earnings at $761,500.54, including $85,000.00 in past wages.
Considering the nature of Poirrier's injuries, the two operations that he has undergone, his constant pain that has prevented *806 a return to his former employment and his disability, we cannot say the $450,000.00 jury award is excessive.

DENIAL OF NEW TRIAL
Cajun further contends that the trial judge erred by refusing to grant its motion (pursuant to LSA-C.C.P. Art. 1972) for a new trial.[2] In support of its motion, Cajun presented three affidavits averring that they had seen members of the jury apparently asleep or with their eyes closed during trial. According to Cajun this jury behavior mandates the granting of a new trial under LSA-C.C.P. 1972.
Assuming the truth of the affidavits, we cannot conclude the trial judge erred in denying the motion for a new trial. To reach a different result would be substituting our judgment for that of the trial judge. Accordingly, we reject Cajun's contention in this regard. The trial judge was in the best position to observe the jury's behavior in this case.

WORKER'S COMPENSATION REIMBURSEMENT
Poirrier contends the trial judge erred in holding him liable individually, jointly, and in solido for the amount of worker's compensation owed to intervenor Fidelity. We agree.
LSA-R.S. 23:1103 provides that when damages are recovered by an injured employee or the employee's dependant against a third party, the damages shall be "apportioned" in the judgment such that the claim of the worker's compensation intervenor shall take precedence over the recovery and the excess if any is assessed in favor of the injured employee or his dependent. Thus, although the statute provides recovery by preference and priority from the injured employee's award, it does not provide that the employee be held liable for compensation paid.

INSURANCE COVERAGE
Cajun had two liability policies in effect at the time of the accident. Northwest Insurance Company was the primary insurer to the extent of $500,000.00. Another policy covering Cajun had been issued by Pacific Employers Insurance Co.
The trial judge, in an amended judgment, cast Northwest to the extent of $450,000.00 but dismissed plaintiff's suit against Pacific.
The area of dispute surrounds the question whether Pacific is an excess carrier and thereby not responsible for the amount of primary coverage provided by Northwest to the extent of $500,000.00. Cajun's $5,000,000.00 excess policy with Pacific designated Northwest as the underlying carrier for Cajun and limited Pacific's liability as follows:
"With respect to personal injury, property damage or advertising injury, or any combination thereof, PEIC's liability shall be only for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:
(a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, [designating Northwest's $500,000.00 comprehensive liability coverage] plus the applicable limits of any other underlying insurance collectible by the Insured; or
(b) the amount specified in Item 3. of the Limits of Liability section of the declarations [$10,000.00] because of personal injury, property damage or advertising injury not within the terms of the coverage of the underlying insurance listed in Schedule A".... [Emphasis ours]
*807 According to Pacific, the trial judge properly exonerated it from liability as an excess insurer because the $450,000.00 verdict was within the limits of Northwest's primary coverage. On the other hand, Poirrier, Cajun, and Fidelity (the worker's compensation insurer) contend that Pacific is liable for the entire amount of the judgment minus a $10,000.00 deductible because Northwest has not provided collectible underlying insurance in this case.
Poirrier further argues that the coverage provided by Northwest was solely for Cajun's premises located in Lafayette, Louisiana and did not extend to Cajun's operations at the LP & L site in Westwego. In support of this contention, plaintiff points out the Northwest policy designates Cajun's Lafayette postal address as the location of Cajun's "usual work places" where operations covered by the policy are conducted and as the location of all "premises owned by, rented to or controlled by" the named insured. According to plaintiff, because there is no underlying insurance for this accident, Pacific becomes the primary insurer.
Considering the various insurance coverage contentions in reverse order, we reject plaintiff's argument that the Northwest coverage does not extend to Cajun's operations outside of Lafayette. Despite the policy's references to Cajun's Lafayette address, the "Comprehensive General Liability Insurance" attachment to the policy clearly states that the policy covers "all operations" of Cajun. We interpret this language to cover all work sites of Cajun regardless of location. Indeed, to limit coverage to Cajun's Lafayette premises would defeat the entire purpose of the policy to provide "Comprehensive" liability protection. Moreover, even if we viewed the provisions concerning location as ambiguous, it is well settled that the policy is to be read broadly in favor of coverage and any ambiguity is to be construed against the insurer. Lombard v. Manchester Life Insurance Company, 406 So.2d 742 (La. 4th Cir.1981) writ denied 410 So.2d 764 (La. 1982). Insurance Company of North America v. Solari Parking, 370 So.2d 503 (La.1979), rehearing denied May 21, 1979. Kendrick v. Mason, 234 La. 271, 99 So.2d 108 (1958), rehearing denied February 10, 1958. Accordingly, we reject Poirrier's contention that the Northwest policy does not apply to this accident.
More compelling and more difficult are the arguments regarding excess coverage advanced by Cajun and Fidelity on the one hand, and Pacific on the other. Cajun and Fidelity claim that because the primary insurer, Northwest, is insolvent and in receivership in the State of Oregon, Pacific moves into the position of a primary insurer. Pacific contends the trial court properly dismissed Pacific based on the unambiguous terms of its excess policy. Citing the policy provision that it is liable only for the loss in excess of the limits of the "underlying insurance" provided by the Northwest policy, "plus the applicable limits of any other underlying insurance collectible for the insured", Pacific argues that there exists no Pacific primary coverage because the word "collectible" relates to insured coverage other than that provided by Northwest.[3]
We do not agree. We find merit to Cajun and Fidelity's interpretation that the word "collectible" refers not only to other underlying insurance (as claimed by Pacific) but also to Northwest's underlying coverage (as claimed by plaintiff, Cajun and Fidelity). We conclude that the use of the phrase "any other" in reference to "underlying *808 collectible insurance" means that Northwest along with any other underlying insurance retained by Cajun must be collectible.
We have not been cited nor have we found any Louisiana cases interpreting language similar to that in the policy in the instant case. However, in Geerdes v. St. Paul Fire & Marine Insurance Co., 128 Mich.App. 730, 341 N.W.2d 195 (1983), a Michigan court was confronted with a situation similar to ours in determining an umbrella carrier's underlying limits. The pertinent portion of the umbrella policy provided:
"(a) As respects (personal liability coverage), the Company's liability shall be only for ultimate net loss in excess of the `underlying limits' defined as the greater of:
(I) an amount equal to the limit(s) of liability indicated beside underlying policy(ies) listed or insurance described in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured;
(II) the retained limit as defined in the last paragraph of Insuring Agreement II if the occurrence is not covered in whole or in part by such underlying policy(ies) or insurance...."
The Geerdes court noted that the purpose of the word "other" was to indicate that the only policies to be considered in calculating the insurer's liability were those collectible by the insured. The court concluded that the language in (a)(I) of the policy meant that both collectible policies listed in Schedule A together with other collectible but unscheduled policies were to be considered in determining the umbrella carrier's underlying limits.
In Beauregard v. Salmon, 211 So.2d 732 (La. 2d Cir.1968), writ refused 252 La. 883, 214 So.2d 550 (1968) and Gros v. Houston Fire & Casualty Insurance Co., 195 So.2d 674 (La. 1st Cir.1967), writ refused 230 La. 644, 197 So.2d 898 (1967), Louisiana courts were faced with the problem of an excess coverage policy which provided that it "shall be excess insurance over any other valid and collectible insurance". The Gros and Beauregard cases both held that the excess insurer "drops down" to provide coverage if the primary coverage is uncollectible because of the primary insurer's insolvency.
We further point out that the Pacific policy language is ambiguious insofar as it defines Pacific's liability for loss in excess of the limits of "the underlying insurance listed in Schedule A [Northwest] ..., plus the applicable limits of any other underlying insurance collectible by the Insured". This ambiguity is evidenced not only by the language itself but by this panel's disagreement as to its interpretation. As stated earlier, all ambiguities are to be construed against the insurer and in favor of coverage. Thus, where the policy fails to state clearly that the excess insurer is not providing coverage in the event the underlying scheduled insurer becomes insolvent, Pacific cannot rely on an ambiguity to escape liability in the instant case.
However, this holding does not end the problem in the instant case. We are confronted with the question of whether a showing of uncollectibility has been made. In the first Beauregard case resulting in a remand, our brothers on the Second Circuit stated that an excess insurer denying liability based on the grounds that the primary insurance is collectible must establish collectibility. Concluding that mere proof of the existence of the primary insurance policy was insufficient to sustain this burden, the Beauregard court remanded the matter for an evidentiary hearing on that question. We are in agreement with the Beauregard holding.
Although both the Northwest and Pacific policies were stipulated and are part of the record, evidence was not adduced on whether the amount of the judgment was collectible against Northwest. Documents filed into the record, however, show that Northwest liquidation proceedings had been instituted in an Oregon court and a receiver appointed, that a Stay Order has issued enjoining parties from obtaining judgments against the company, and that *809 an order and plan for liquidation of Northwest has been issued.
Under these circumstances, we are compelled to remand this matter for the limited purpose of hearing evidence on whether that judgment against Northwest is collectible at the time that this matter is heard on remand.
Accordingly, IT IS ORDERED that the judgment of the trial court is affirmed insofar as casting judgment in favor of plaintiff and against Cajun and Northwest Insurance Company in the sum of $450,000.00 and legal interest from date of demand until paid.
That part of the judgment dismissing Pacific Employers Insurance Co. is reversed and set aside. The matter is remanded in this regard consistent with the views expressed herein.
That part of the judgment insofar as it casts plaintiff Poirrier liable to the intervening compensation insurer for the full amount of compensation and medical benefits paid, is reversed and set aside and recast as follows: IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of The Fidelity and Casualty Company of New York, intervenor, for the recovery by preference and priority from plaintiff's award, of all amounts intervenor has paid or will pay to plaintiff in worker's compensation and medical benefits.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
BYRNES, J., dissents in part.
SCHOTT, J., dissents for the reasons assigned by BYRNES, J.
BYRNES, Judge, dissenting in part.
I must respectfully dissent from that portion of the majority opinion which holds that if Northwest's primary coverage is not collectible due to insolvency, Pacific "drops down" and becomes a primary insurer. The majority's conclusion is based on its adherence to Beauregard v. Salmon, 211 So.2d 732 (La.App. 2nd Cir.1968) and Gros v. Houston Fire & Casualty Insurance Co., 195 So.2d 674 (La.App. 1st Cir.1967).
I would distinguish those cases on the basis of the policy language involved. In both Beauregard and Gros the excess coverage policy provided that it "shall be excess insurance over any other valid and collectible insurance." This language clearly imposes the prerequisite of collectibility on all other policies. In contrast, the language of the excess policy in this case provides in pertinent part that the excess carrier is only liable for damages which exceed "an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured;"
In my opinion, this language clearly creates two tiers of primary coverage the first of which is not limited by the collectibility language of the second. The use of a comma between the words "hereof" and "plus" indicates two discrete phrases. The use of the words plus in the second phrase further separates the collectibility language of phrase two from application to phrase one. In short, this limitation seems to me to be comprised of; 1) "the underlying limits listed in Schedule A (the Northwest policy) taken without regard to collectibility and; 2) the applicable limits of other insurance which is collectible by the insured.
This interpretation of Pacific's policy seems all the more equitable and realistic when one considers the nature of excess insurance and the risks which excess insurers contemplate when writing such policies. Excess insurance exists to cover liability which exceeds other primary coverage. The excess insurer thus has a significantly lower risk than a primary insurer, and this reduced risk is reflected in the cost of the policy. The majority's ruling in essence makes the excess carrier the insurer of solvency of the primary carrier, a risk which is not reflected in the cost of excess insurance and in my opinion, was not intended by the parties to the insurance contract.
*810 For the foregoing reasons I would affirm the dismissal of Pacific. In all other respects I subscribe to the majority opinion.
NOTES
[1] Other defendants originally named in the suit were not cast in judgment and their liability is not at issue on this appeal.
[2] "LSA-C.C.P. Art. 1972

A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done."
[3] "With respect to personal injury, property damage or advertising injury, or any combination thereof, PEIC's liability shall be only for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:

(a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured; or
(b) the amount specified in Item 3. of the Limits of Liability section of the declarations because of personal injury, property damage or advertising injury not within the terms of the coverage of the underlying insurance listed in Schedule A: ..."