555 So.2d 581 (1989)
Lew A. ROBICHAUX
v.
Harold L. RANDOLPH, Sr., Howard Trucking Co., Inc., Transit Casualty Insurance Co. and Louisiana Insurance Guaranty Association.
No. 88CA1836.
Court of Appeal of Louisiana, First Circuit.
December 19, 1989.
Writ Granted February 7, 1990.
Writ Denied February 16, 1990.
*582 William Stark, Houma, for plaintiff and appellee, Lew Robichaux.
Henry G. Terhoeve, Baton Rouge and Morris M. Haik, Jr., New Iberia, for defendants and 1st appellants, Louisiana Ins. Co. Assn. and Howard Trucking Co.
Wood Brown, III, New Orleans, for defendant and 2nd appellant, Intern. Ins. Co.
Before CARTER, SAVOIE and ALFORD, JJ.
SAVOIE, Judge.
Plaintiff, Lew A. Robichaux, filed suit seeking to recover damages for injuries he sustained when he collided with an eighteen wheeler truck operated by Harold Randolph. Named as defendants were Randolph; Howard Trucking Company Inc. (HTC), Randolph's alleged employer; and Transit Casualty Co. (Transit), the primary insurer of HTC.[1] The plaintiff amended his petition to add Louisiana Insurance Guaranty Association (LIGA) as a defendant *583 when Transit became insolvent. International Insurance Company (International), an excess insurer of HTC, intervened to unite with the defendants in resisting the plaintiff's demands; alternatively, International sought a judgment that its policy was not obliged to respond to the plaintiff's claim or demand until it exceeded $1,000,000.00, the amount of Transit's policy coverage. The accident occurred on April 23, 1985, on Highway 90 in Terrebonne Parish; the truck operated by Randolph straddled across the roadway, blocking both lanes of travel, and the plaintiff collided with it.
The trial judge, in written reasons for judgment, found that Randolph was negligent, that the plaintiff was not at fault, and that HTC was vicariously liable for Randolph's negligence. In accordance with his written reasons for judgment, the trial judge rendered judgment in favor of the plaintiff and against HTC, LIGA, and International.[2] The plaintiff was awarded $310,000.00 together with legal interest and costs; LIGA was to pay $149,900.00 (that portion of the judgment between $100.00 and $150,000.00), together with legal interest and all court costs, and International was to pay that portion of the judgment exceeding $150,000.00, together with legal interest. From the judgment, LIGA and HTC and International appeal.
LIGA and HTC raise the following assignments of error:
1) the trial court erred in finding that HTC was vicariously liable for the negligence of Randolph.
2) the trial court erred in awarding excessive damages to the plaintiff.
3) the trial court erred in finding that the coverage of the excess carrier did not drop down in lieu of coverage by LIGA.
4) the trial court erred in assessing LIGA with legal interest and all costs.
International urges the following assignment of error on appeal:
1) the trial court erred in finding International responsible for any of the plaintiff's $310,000.00 award since International's underlying policy limit was $1,000,000.00.

Assignment of Error No. 1:

HTC's Liability
The truck driven by Randolph at the time of the accident was owned by Herman Scott, who leased it to HTC. The trial judge found that HTC was vicariously liable for Randolph's negligence because he determined that it had an employer-employee relationship with Randolph. The trial judge based this determination on the following factors: that HTC approved and qualified drivers for their leased vehicles, that HTC paid Randolph, that HTC dispatched drivers directly, and that drivers returned to the HTC yard after a run.
Two witnesses testified regarding the relationship of HTC and Randolph. At the trial, Alvin Hernandez, HTC's vice president, testified that Randolph was not an employee of HTC and that Randolph drove for Scott. Hernandez explained that HTC leased the truck from Scott for a percentage of the haul. Hernandez testified as to HTC's method of operations: a customer would call an HTC terminal; the dispatcher would go down a list of trucks and call the lease (truck) owners to inform them of the job; if the owner accepted the job, the dispatcher would tell him where to pick up the cargo, where to deliver it, and the time by which it needed to be delivered. HTC had no control over the driver's route and no rules as to the driver's speed or manner of driving. While Hernandez testified that Scott hired Randolph, HTC did have drivers fill out an employment application listing their previous employers and driving record. HTC also ran a check on the driver known as the MVR and gave the driver a written test and a road test. Hernandez testified that this was to comply with DOTD requirements and with HTC's insurer's requirements. Should the driver fail to pass HTC's tests or meet the qualifications, HTC would not allow him to drive for it. Hernandez testified that HTC had no authority to fire Randolph but that if, for example, he received traffic tickets, HTC *584 would tell Scott that Randolph could no longer drive for HTC. HTC had two methods of payment to drivers: one was to issue a check only to Scott, the truck owner, and Scott would do his own payroll, and the second was to issue a check to Scott and a check to Randolph on behalf of Scott. For the latter method, HTC withheld social security and income tax from Randolph's check; Hernandez explained that the driver's gross pay was deducted from the lease owner and that HTC cut the checks in this manner because other competitors did this; for this method of payment, HTC charged a fee to Scott. Hernandez also said that Scott set the amount of Randolph's pay. Hernandez testified that HTC gave no benefits to the drivers, nor did it train them. The owner of the truck was responsible for its upkeep, but HTC did provide insurance on the trucks.
Patsy Wenzel, an HTC terminal manager, testified by deposition that she "hires and fires" lease owners and truck drivers, and corroborated Hernandez's testimony as to the testing of drivers and the payment of drivers. Wenzel testified that she called Randolph directly to dispatch him on the run during which the accident occurred. Wenzel testified that if a driver was involved in an accident, he had a safety meeting with her, and that she met with Randolph after the accident.
The most important factor to consider in determining whether an employer-employee relationship exists is the right of the employer to control the work of the employee. Hopping v. Louisiana Horticulture Commission, 509 So.2d 751, 754 (La. App. 1st Cir.1987). "The factors used to determine the right to control are selection and engagement, payment of wages, power of dismissal, and power of control." Hopping, 509 So.2d at 755.
HTC required all drivers to pass tests before they could drive for HTC and HTC also would not let drivers who no longer met their qualifications drive for them. This evinces HTC's right of control over the drivers. Accordingly, the trial court found that HTC was the employer of Randolph. Factual findings of the trial court are entitled to great weight and will not be overturned unless clearly wrong. See Green v. Cement Products Services, Inc., 526 So.2d 493 (La.App. 1st Cir.), writ denied, 531 So.2d 270 (La.1988). In the case sub judice, we cannot say that the trial court's finding of an employer-employee relationship is clearly wrong. For these reasons, this assignment of error has no merit.

Assignment of Error No. 2:

General Damages
The trial judge awarded the plaintiff $310,000.00 in general damages. The award consisted of $125,000.00 for past and future physical and mental pain and suffering, $18,000.00 for future medical expenses, $57,000.00 for past loss of wages, and $110,000.00 for future loss of wages. We will first discuss the awards for pain and suffering and medical expenses, and then we will discuss the awards for lost wages.
Dr. William Kinnard, the orthopedic surgeon who treated the plaintiff, testified that the plaintiff sustained traumatically induced chondromalacia to his left knee. After conservative treatment was unsuccessful, Dr. Kinnard performed arthroscopic surgery. Despite the success of the surgery, the plaintiff will still suffer a 5% disability to his knee, and cannot perform repetitive squatting or climbing. Dr. Kinnard diagnosed the plaintiff as sustaining a herniated disc at C5-C6; for this, Dr. Kinnard recommended an anterior cervical diskectomy and fusion because conservative treatment had given the plaintiff no relief. This surgery would cost approximately $9,000.00. Dr. Kinnard assigned a 15% disability to the plaintiff's body as a whole due to the disc problem in his neck, and testified that the plaintiff could not engage in regular lifting of over twenty-five to thirty pounds, overhead work, climbing or crawling. Dr. Kinnard also testified that the plaintiff sustained disc abnormalities at L4-L5, for which he was treating the plaintiff conservatively. Dr. Kinnard testified that surgery would be indicated should a myleogram confirm his diagnosis and the plaintiff's complaints of pain persist. This surgery would cost approximately $11,000.00. *585 Dr. Kinnard testified that in his opinion, all of the plaintiff's injuries were due to the accident of April 23, 1985.
Dr. Christopher Cenac, an orthopedic surgeon who was a witness on behalf of the defendants, testified by deposition that he saw the plaintiff on two occasions, both over two years after the accident; in his opinion, he felt the plaintiff did not have herniated discs, that he did not need surgery, and that he had no physical limitations.
The trial judge in his reasons for judgment stated that he gave greater weight to Dr. Kinnard's testimony since he was the plaintiff's treating physician.
This court in the case of Wells v. Allstate Insurance Co., 510 So.2d 763, 767-768 (La.App. 1st Cir.), writ denied, 514 So.2d 463 (La.1987), discussed the weight to be given the opinion of a treating physician:
It is well settled that the testimony of the treating physician is entitled to greater weight than the testimony of a physician who examines the patient only once or twice. However, the weight afforded such testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based.
Further, the reason for the preference of a treating physician's testimony is that the treating physician is more likely to know the patient's symptoms and complaints due to repeated examinations and sustained observations. (Citations omitted).
Applying these principles to the case at bar we cannot say that the trial court erred in giving the testimony of Dr. Kinnard greater weight than that of Dr. Cenac.
In reviewing an award of damages, the court must first determine whether the trial court's award for the particular injuries and their effect on this particular injured person is a clear abuse of its very great discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). In the case sub judice, after a thorough review of the record, we can not say that the trial court abused its discretion in its award of damages for the plaintiff's pain and suffering and for his future medical expenses.
We have reviewed the testimony concerning the plaintiff's lost wages. Dr. Mel Wolfson, the plaintiff's economic expert, testified that before the accident the plaintiff had an earning capacity of $43,750.00 per year, and that the plaintiff's past lost wages were $59,937.00 based on the plaintiff's federal income tax returns before and after the accident. Dr. Wolfson testified that the plaintiff's future lost earning would be $877,241.00 if he never worked again in the future; $740,382.00 if he worked for minimum wage after the accident, and $438,620.00 if he could only make half of his previous earnings. Dr. Wolfson testified that the plaintiff was born on May 30, 1952, and that his work life expectancy was 25.16 years. The plaintiff worked in the oilfield industry, repairing and selling oilfield equipment. Dr. Wolfson could not say whether the decline in the oil industry after 1981-82 was a factor in the plaintiff's loss of income following the accident. However, he did testify that prior to the accident, while the oilfield was experiencing its recession, the plaintiff's yearly income was increasing.
The plaintiff testified that he had a high school education and that he had always worked in the oil industry, primarily working for wireline services. The plaintiff testified that prior to the accident his work involved lifting heavy equipment, which he could no longer do after the accident.
From our review of the testimony and evidence, we can not say that the trial court abused its discretion in awarding $57,000.00 in damages for past loss of wages and $110,000.00 for future loss of wages. This assignment of error has no merit.

Assignment of Error No. 3 and International's Assignment of Error:

Liability of Liga and International
The trial judge in his reasons for judgment found that LIGA was liable in the place of Transit, the insolvent primary insurer, for damages between $100.00 and $150,000.00, pursuant to LSA-R.S. *586 22:1379(3), 22:1382(1)(a) and (1)(b).[3] The trial court then found that International was liable for all amounts in excess of $150,000.00.
This issue between the same parties was recently decided by this court in Louisiana Insurance Guaranty Association v. International Insurance Co., 551 So.2d 50 (La. App. 1st Cir.1989). LIGA filed a declaratory judgment suit against International and Hudson Insurance Company, another excess insurer of HTC; LIGA sought a determination that the excess insurers' coverage would drop down and that LIGA's coverage would not come into play unless the excess coverage was not available or exhausted. This court affirmed the trial court's dismissal of LIGA's suit on motions for summary judgment filed by the two defendants. We found that the trial court was correct in deciding that LIGA provided primary coverage to the extent of its statutory authority. In reaching our decision, we relied on Gibson v. Kreihs, 538 So.2d 1057, 1059 (La.App. 4th Cir.), writ denied, 541 So.2d 856 (La.1989), wherein the Fourth Circuit held that in cases of insolvency of the primary insurer, "whether the excess insurer is liable only for the amount of the claim in excess of the retained limits or whether its coverage drops down to that of the primary insurer is determined by the words of the excess policy." We found that the language of the International policy provided that excess insurance coverage was over the liability limits of the underlying policies listed in the schedule, regardless of the bankruptcy or insolvency of the underlying insurer.
The issue of whether International would drop down to provide coverage above $150,000.00 was not before us on appeal in LIGA's declaratory judgment action against International.[4] However, in this case, the trial judge ruled that International's coverage drops down to provide coverage above $150,000.00 and International is contesting that part of the decision on appeal.
Relying on the Gibson case, we find that the International policy does not drop down to provide coverage above $150,000.00. In Gibson, the Fourth Circuit found that the coverage of the excess insurer, International, did not drop down to provide first dollar coverage or to provide coverage above LIGA's statutory liability; the Fourth Circuit based its finding on the language of the International policy which provided *587 that the excess insurer was liable only for an ultimate net loss in excess of the applicable limits of the primary insurer's policy. The language of the International excess policy in this case is identical to that in the Gibson case. The language of the International policy regarding liability states as follows:
The Company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:
(a) the total of the applicable limits of the underlying policies listed in Schedule A hereof [$1,000,000.00], and the applicable limits of any other insurance collectible by the insured; or
(b) the self-insured retention stated in Item 4(c) of the declarations as the result of all occurrences not covered by said underlying insurance, and which shall be borne by the insured, separately as respects each annual period of this policy.
The International excess policy in this case and in Gibson also provides for the contingency of the insolvency of the primary insurer:
O. Maintenance of Underlying Insurance. It is warranted by the insured that the underlying policies listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force during the currency of this policy, except for any reduction of aggregate limits contained therein solely by payment of claims in respect of occurrences happening during this policy period. In the event of failure by the insured to so maintain such policies in force or to meet all conditions and warranties subsequent to loss under such policies the insurance afforded by this policy shall apply in the same manner it would have applied had such policies been so maintained in force.
In the event there is no recovery available to the insured as a result of the bankruptcy or insolvency of the underlying Insurer, the coverage hereunder shall apply in excess of the applicable limit of liability specified in Schedule A. The court in Gibson distinguished the case of McGuire v. Davis Truck Services, Inc., 518 So.2d 1171 (La.App. 5th Cir.), writ denied, 526 So.2d 791 (La.1988), relied on by the trial court in the case at bar. In McGuire, the policy set forth the excess insurer's liability as being above "the amount recoverable under the underlying insurances as set out in ... the Declarations." The Fifth Circuit found the words "amount recoverable" to be ambiguous and equated them with "collectible"; the court concluded that LIGA assumed the position of the insolvent primary carrier and that the excess insurer dropped down to cover losses in excess of LIGA's statutory limits. Likewise, the supreme court case of Nasello v. Transit Casualty Co., 530 So.2d 1114 (La.1988), wherein the court held that the excess insurer dropped down to provide first dollar coverage, is distinguishable because the excess policy stated that the insurance provided thereunder was excess over any other "collectable" insurance.
LIGA, HTC, and the plaintiff rely on the case of Poirrier v. Cajun Insulation, Inc., 501 So.2d 800 (La.App. 4th Cir.1986), writs denied, 502 So.2d 579 (La.1987), in support of their contention that the International policy should drop down. The court in Poirrier interpreted the language of the excess insurer's policy to require a drop down. The language in the policy stated, in pertinent part, that the excess insurer's liability would be "for the ultimate net loss in excess of the insured's retained limit defined as the greater of:
(a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, [designating Northwest's $500,000.00 comprehensive liability coverage] plus the applicable limits of any other underlying insurance collectible by the Insured;..."
Poirrier, 501 So.2d at 806. The court found that the word collectible referred to not only the other insurance policies but also to the primary underlying insurance policy listed in the schedule. The court found that the policy language was ambiguous, and then stated: "[W]here the policy fails to state clearly that the excess insurer *588 is not providing coverage in the event the underlying scheduled insurer becomes insolvent, Pacific [the excess insurer] cannot rely on an ambiguity to escape liability...." Poirrier, 501 So.2d at 808. We note that in the case sub judice, the policy does clearly state the limits of the excess insurer's coverage where the primary insurer becomes insolvent. Thus, we find that the language of the International policy clearly expresses that International does not drop down to provide coverage for claims less than $1,000,000.00, despite the insolvency of the primary insurer. This assignment of error raised by International has merit and the judgment of the trial court finding International liable for that part of the judgment exceeding $150,000.00 is reversed.

Assignment of Error No. 4:

Legal Interest and Court Costs as to LIGA
LIGA contends that it should not have to pay any court costs since International should have been held liable for the entire judgment and alternatively that the court costs should have been apportioned between it and International. Since we have decided that International is not liable for any part of the plaintiff's judgment, these contentions have no merit.
LIGA also contends that it should not be held liable for interest on its part of the award, since the principal amount of the award together with interest would exceed LIGA's statutory liability of $149,900.00. We agree with the holding of the Fourth Circuit in Aramburo v. Travelers Insurance Co., 438 So.2d 274 (La.App. 4th Cir.1983), writ denied, 443 So.2d 1110 (La. 1984), that LIGA's statutory liability limit does not prevent an award of interests and costs in addition to the $149,900.00 award. This assignment of error has no merit.
For the above and foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part. Costs of this appeal are assessed against HTC and LIGA.
AFFIRMED IN PART, AND REVERSED IN PART.
NOTES
[1] Plaintiff incorrectly named defendant Transit Casualty Co. in his petition as Transit Casualty Insurance Company.
[2] We note that Randolph never answered the plaintiff's petition.
[3] The statutes relied on by the trial court read in pertinent part as follows:

§ 1379. Definitions
As used in this Part:
(3) `Covered claim' means an unpaid claim, including one for unearned premiums by or against the insured or agent, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Part applies issued by an insurer, if such insurer becomes an insolvent insurer after September 1, 1970, and (a) the claimant or insured is a resident of this state at the time of the insured event; or (b) the property from which the claim arises is permanently located in this state. `Covered claim' shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise.
§ 1382. Powers and duties of the association
(1) The association shall:
(a) Be obligated to the extent of the covered claims existing prior to the determination of the insurer's insolvency, or arising after such determination but prior to the first to occur of the following events: (i) expiration of thirty days after the date of such determination of insolvency, (ii) expiration of the policy, or (iii) replacement or cancellation of the policy at the instance of the insured if he does so within thirty days of the determination, but such obligation shall include only that amount of each covered claim, except return premiums, which is in excess of one hundred dollars and is less than one hundred fifty thousand dollars.... In no event shall the association be obligated to a policyholder or claimant in an amount in excess of the obligation of the insolvent insurer under the policy from which the claim arises.
(b) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent.
[4] In LIGA's declaratory judgment action, the trial judge did state in oral reasons for judgment that LIGA must provide coverage for the first $150,000.00 and that International would drop down to provide coverage above $150,000.00. However, the signed judgment, which controls, simply granted the defendants' motions for summary judgment and dismissed LIGA's petition. Furthermore, only LIGA appealed and International did not answer the appeal.