**LUMAR MARINE, INC.,**
**Plaintiff–Appellant,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant–Appellee.**

No. 90–3125
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 7, 1990.

Joseph B. Guilbeau, Dean A. Sutherland, Sutherland, Juge, Horack & Dwyer, New Orleans, La., for plaintiff-appellant.

John Emerson Galloway, Galloway, Johnson, Thompkins & Burr, New Orleans, La., Henry D.H. Olinde, Baton Rouge, La., for defendant-appellee.

Before GEE, SMITH and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff–Appellant, Lumar Marine, Inc. ("Lumar"), appeals from the district court's grant of a Motion for Summary Judgment in favor of Insurance Company of North America ("INA"), dismissing Lumar's complaint. Finding no error, we affirm.

## I.

This is a diversity case originally filed by Lumar against INA in state court in Plaquemines Parish, Louisiana, and from there timely removed by INA to the United States District Court for the Eastern District of Louisiana. The parties and the district court unanimously concluded that the substantive law of Louisiana applied in this case. On the basis of stipulated facts INA filed a motion for summary judgment seeking dismissal of Lumar's complaint. INA urged that its policy of excess insurance did not "drop down" to provide primary insurance coverage to Lumar when Lumar's primary carrier became insolvent. Lumar filed a cross-motion for summary judgment on the same issue, contending that INA's excess coverage did drop down under those circumstances. When the District Court granted INA's motion and entered judgment dismissing Lumar's complaint, Lumar appealed.

## II.

This case was filed after Lumar was cast in judgment in *Simeon v. T. Smith & Son, Inc.*, No. 84–4705 (E.D.La.1984), *aff'd, Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421 (5th Cir.1988), *cert. denied sub nom, Lumar Marine, Inc. v. Simeon*, — U.S. ——, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Simeon's recovery resulted from an accident that occurred on September 27, 1981, on the M/V Tako Bandit,[1] one of several vessels owned by Lumar and primarily insured by Glacier General Assurance Company ("Glacier") up to $500,-000.00. The final judgment in favor of Simeon exceeded that amount.

At the time of Simeon's accident, a policy of excess insurance issued by INA covered Lumar's vessels, including the M/V Tako Bandit. That policy covered the type of risk upon which Simeon's judgment was based. Glacier became insolvent after Simeon's accident but before his litigation

---

**1.** In the district court opinion the vessel's name appears as "TACO BANDIT," but the policy endorsement and other materials reflect "Tako" as the first name of that and each other Lumar vessel.

was completed. Glacier was not a member carrier of the Louisiana Insurance Guaranty Association ("LIGA"), so Lumar had no claim for relief from that organization.

At issue in this case is whether INA's policy, issued to cover Lumar's liability in excess of its coverage under the Glacier policy or any other insurance, must "drop down" to provide coverage to Lumar from "dollar one" because of Glacier's insolvency and LIGA's absence of coverage. The answer to that question lies in the wording of the INA policy, interpreted according to the law of Louisiana.

An examination of the INA policy reveals the following:

### 1.

The upper right-hand corner of the first page of the policy contains a multiple choice check list for the type of coverage provided. A typed "x" appears to the left of the first of those choices, *"Excess* Protection & Indemnity." (emphasis added)

### 2.

The words "as per schedule" are typed into the blank that follows the dollar sign in "Limits of Liability: $ ____."

### 3.

The following paragraph appears in the center of the first page:

INSURING CONDITIONS: This insurance shall, subject to the terms and conditions herein, indemnify the Assured [Lumar] for all sums which the Assured shall become obliged to pay for liability described in and insured against in underlying primary insurances listed hereon, but this insurance is warranted free from claims in respect of any one loss, accident or occurrence unless the aggregate of such claims exceed [sic] the *amounts insured* in the primary underlying insurances in which event this Company shall be liable only for the amount by which such aggregate exceeds the limit of liability in the primary underlying insurance not to exceed, however, the Limit of Liability as shown on Line 9 of

this policy ["$ as per schedule"] for any one accident or occurrence arising out of the same event:" (emphasis added)

### 4.

Three column headings appear under the heading PRIMARY UNDERLYING INSURANCES. Under Primary Insurer, the words "Glacier General Assurance Company" are typed; under Primary Insurer's Policy Number, the serial number of the primary insurance policy is typed; and under Primary Insurer's Limit of Liability, the words "as per policy" are typed into a blank that follows a printed dollar sign and appears immediately above the parenthetical statement, "(if no amount is shown hereon see endorsement for schedule)."

### 5.

The pertinent special conditions of the policy appear as follows:

### SPECIAL CONDITIONS

Notwithstanding anything to the contrary, no liability shall attach for:

A. Legal fees for claims paid or payable under the *scheduled Primary and/or underlying forms of policies except as excess over such policies.* (emphasis added)

B. *The deductible contained in the Primary and/or underlying policies.* (emphasis added)

. . . . .

In no event is this insurance to be considered as contributing or double insurance.

### 6.

To the right of the marginal caption BANKRUPTCY OR INSOLVENCY, appears the statement, "Bankruptcy or insolvency of the Assured shall not relieve this Company of any of its obligations hereunder." [Nowhere does the policy mention the bankruptcy or insolvency of the primary insurance carrier.]

**7.**

To the right of the marginal caption OTHER INSURANCE appears:

If other collectible insurance with any other insurer is available to the Assured covering a loss also covered hereunder (except insurance purchased to apply in excess of the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy(ies) of this Company is available to the Assured, covering a loss also covered hereunder (other than *the primary insurance of which the insurance afforded by this policy is in excess*), the Company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies). (emphasis added)

**8.**

To the right of the marginal caption LEGAL COSTS appears:

Should any claim, or series of claims arising out of one occurrence or accident, appear likely to exceed the *limit of liability in the Primary and/or underlying Policy(ies)*, no legal costs shall be incurred on behalf of this Company without its consent being first obtained. Should such claim or claims be adjusted prior to trial court judgment for a sum or aggregate sum of not more than *the limit of liability in the Primary and/or underlying policy(ies)*, then no legal costs shall be payable by this Company. Should however, the sum or aggregate sum for which such claim or claims are adjustable prior to the rendering of trial court judgment(s) exceed *the limit of liability in the Primary and/or underlying policy(ies)*, then the Company, if it consents to trial court proceedings continuing, shall contribute to the legal costs in the ratio of its proportion of the liability for the judgment(s) rendered, or settlement(s) made, bears to the whole amount of said judgment(s) or settlement(s). (emphasis added)

**9.**

To the right of the marginal caption PRIMARY AND UNDERLYING POLICIES appears in part:

This insurance shall follow any changes made under primary and underlying policies but this Company shall be advised of any such changes as promptly as possible. If underlying *amounts of insurance* are reduced without prior agreement of this Company, this Company shall only be liable to the same extent as if present *underlying amounts had been maintained.* (emphasis added)

**10.**

Endorsement #1 to the policy, titled "Schedule of Vessels," consists of four columns: Under "Vessel," the names of five vessels are listed, including "Tako Bandit"; under "Excess Limit of Liability," $4,500,000.00 is listed for each vessel; under "Primary Limit of Liability," $500,000.00 is listed for each vessel; and under "Premium," $2,750.00 is listed for each vessel.

**III.**

This court reviews the grant of summary judgment motion de novo, using the same criteria used by the district court in the first instance. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988). We "review the evidence and any inferences to be drawn therefrom in the light most favorable to the non-moving party." *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (citing *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 873 (5th Cir.1984)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liber-*

*ty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

Our review of the entire INA policy, the stipulated facts, the briefs of appellant and appellee, and the opinion of the district court, convinces us that the district court reached the correct conclusion for the correct reasons under the Louisiana jurisprudence then extant. We are constrained, however, in our de novo review of this case, to consider it in light of late-breaking developments in Louisiana's jurisprudence on drop down coverage in excess insurance policies.

In its original brief to this court, Lumar advised that two cases were then pending before the Supreme Court of Louisiana, *Robichaux v. Randolph,* 555 So.2d 581 (La. App.1989), *cert granted,* 556 So.2d 1288 (La.1990), and *Kelly v. Weil, writ granted,* 556 So.2d 1288 (La.1990). Lumar's brief also noted that "it appears that the Louisiana Supreme Court is preparing to write a comprehensive decision on the drop down issue.... Even if it is not directly on point, the Supreme Court of Louisiana's decision would certainly be instructive on the present issues."

That prophetic observation proved to be both accurate and unfortunate for Lumar. The Louisiana Supreme Court handed down opinions in *Kelly,* 563 So.2d 221, and *Robichaux,* 563 So.2d 226, on June 4, 1990. That court selected *Kelly* as the case in which to espouse the method Louisiana courts (and federal courts in diversity cases) shall henceforth employ to analyze excess insurance policies when determining whether excess coverage "drops down" to provide primary coverage upon the insolvency of the carrier which had provided primary coverage.

As he had done in his original brief, able counsel for Lumar made a valiant and scholarly effort to make the best of a bad situation. Filing a reply brief with this court, counsel for Lumar toiled mightily to alchemize the base metal of the *Kelly* opinion into gold for his client. But, alas, the

philosopher's stone remains mythical; *Kelly* seals Lumar's fate in this litigation.

Writing for a unanimous court in *Kelly,* Chief Justice Calogero observed:

A review of the state and federal jurisprudence in this country reveals that the controlling consideration on this "drop down" issue is the agreement between the insurer and the insured, namely, the insurance policy itself. Basically three types of excess policies are to be found in the cases.

The *Kelly* court determined that the first such category consists of those policies under which drop down occurs because they contain clear and unambiguous language that ties excess coverage to the amount of primary insurance proceeds and other insurance proceeds that are *collectible.* The second category consists of those policies under which drop down does not occur because they define their limits by reference to the policy limits of scheduled primary insurance. The third category consists of those policies which contain potentially ambiguous definitions of their limits of liability by employing formulae based on the sum of the limits of primary coverage, "and" or "plus" any other *collectible* insurance. The *Kelly* court's review of the jurisprudence determined that drop down was held to occur in some cases in the third category but not in the majority.

The court placed the *Kelly* policy in the third category, the one in which "the insured's 'retained limit' is defined as the greater of the 'applicable limits of the scheduled underlying policies, and [or *plus*] the applicable limits of any other insurance collectible by the insured.'" The *Kelly court* noted that such phraseology "at least arguably raises the question of whether the excess insurance kicks in if *the underlying insurance* is not 'collectible by the insured.'" (emphasis in original)

The Louisiana Supreme Court found that a minority of the courts, including Louisiana's Fourth Circuit in *Poirrier v. Cajun Insulation, Inc.,* 501 So.2d 800 (La.App. 1986), find first that such language is ambiguous, then that "collectible" modifies both "other insurance" and the scheduled

"underlying policies," and finally that the excess insurance drops down because the "retained limit" excludes the scheduled underlying policy limits to the extent they are not collectible. The Supreme Court, however, rejected that minority position, expressly overruling *Poirrier* (the most important case Lumar cited in support of its argument) in the process. The *Kelly* court embraced the majority jurisprudence of this country in finding, first, that there was no ambiguity and, second, that there was no requirement that to avoid drop down the proceeds of the underlying policy be *collectible*. In support of that position, the *Kelly* court cited two cases from this court, *Transco Explor. Co. v. Pacific Employers Ins. Co.*, 869 F.2d 862 (5th Cir.1989), and *Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258 (5th Cir.1986).

Moreover, as Lumar itself observed, the language in the INA policy is not identical to the language in the policies in *Kelly and Robichaux*. For purposes of the point under consideration, the principal difference is that, unlike the language of the policies in *Kelly's* third category, the pertinent language of the INA policy (quoted *in extenso* as item 3. above) does *not* define the insured's retained limits in terms of "the greater of the applicable limits of the scheduled underlying policy *and* [or *plus*] the applicable limits of any other insurance collectible by the insured." (emphasis added)

Thus, the INA policy does not fall within *Kelly's* third category. It falls instead within the *Kelly* opinion's second category.

Our reading of the above quoted provisions from the INA policy, particularly the INSURING CONDITIONS and ENDORSEMENT #1, places that policy squarely in the second category of excess policies under *Kelly*. The Louisiana Supreme Court defined the policies in its second category as those which "describe the excess coverage as the excess of the limits of the policies 'covered' in schedules attached to the policy.... The retained limit in this instance is simply the limits of the policies 'covered' in the attached schedules. Excess coverage is not made dependent on

recoverability or collectibility of the amount." Other than the OTHER INSURANCE provision (upon which Lumar relies in its effort to place the policy in *Kelly's* third category), none of the quoted provisions even mention the "recoverability" or "collectibility" of the underlying primary insurance proceeds. They do, however, refer repeatedly and consistently to the primary insurer's *"limit of liability."*

Furthermore, as to Lumar's contention that the phrases *"amounts insured"* and *"limit of liability"* which appear in the INSURING CONDITIONS provision are ambiguous, a fair reading of the phrase "underlying amounts of insurance" in the PRIMARY AND UNDERLYING POLICIES provision demonstrates that the former phrases are synonymous. In the context of the latter provision, the term can only mean the limit of liability. As to that provision, INA established that if the insured and the primary insurer agreed without INA's approval to reduce the latter's limit of liability, only so much of the liability as might exceed the original limit of liability for the primary insurer would trigger liability for INA, the excess insurer.

Even if, however, the INA policy had placed this case within *Kelly's* third category, drop down still would not occur under the *Kelly* test for that category. Lumar would argue that the conjoining of the INA's policy's INSURING CONDITIONS provisions and its OTHER INSURANCE provisions might more properly place the policy within the third *Kelly* category. But those two INA provisions are far more disjunctive than were the phrases which only a comma and the conjunction "and" separated within the single provision in the *Kelly* policy. In the INA policy they are separate sentences, appearing in separate provisions that themselves appear on separate pages. They are as separate functionally as they are spatially.

## CONCLUSION

The issue of whether the excess insurance policy in this case must drop down to cover the $500,000.00 primary coverage that the Glacier policy would have

provided had Glacier not become insolvent really asks which of two innocent parties, Lumar or INA, bore the risk of Glacier's insolvency. Like most other jurisdictions, Louisiana adheres to the following maxims when interpreting contracts: (1) the contract is the law between the parties; (2) ambiguous contractual provisions are construed against the drafter; and (3) the printed language of an insurance policy is construed strictly against the insurer and in favor of the insured. In this case the district court found no ambiguity and, despite its application of that third maxim, determined it was Lumar, not INA, which must bear the burden of Glacier's insolvency. The district court found so on the basis of its sound analysis of the pre-*Kelly* Louisiana jurisprudence, including *Poirrier,* and we concur in that analysis. Now that the Louisiana Supreme Court in *Kelly* has spoken directly and comprehensively on the drop down issue, any possible doubt about the propriety of the district court's holding in this case has been removed.

AFFIRMED.