899 F.2d 1116
 Clara SHAPIRO, individually and in her capacity as Personal
Representative of the Estate of Irving Shapiro,
deceased, Plaintiff-Appellant,
v.
ASSOCIATED INTERNATIONAL INSURANCE COMPANY, a foreign
corporation, Defendant-Appellee.
The CALIFORNIA CLUB, INC., a Florida corporation,
Plaintiff/Counter-defendant-Appellant,
v.
ASSOCIATED INTERNATIONAL INSURANCE COMPANY, a California
corporation, Defendant-Counter-plaintiff-Appellee.
 Nos. 89-5260, 89-5512.
 United States Court of Appeals,
Eleventh Circuit.
 April 30, 1990.
Rehearings Denied July 16, 1990.
 
 Thomas E. Ice, Howard Barwick, Barwick, Dillian, Lambert & Angel, P.A. Miami Shores, Fla., for plaintiff-appellant.
 Roy D. Wasson, Miami, Fla., for defendant-appellee.
 David C. Appleby, Womack, Lombana & Bass, P.A., Victor H. Womack, Miami, Fla., Howard Barwick, Miami Shores, Fla.
 Appeals from the United States District Court for the Southern District of Florida.
 Before FAY and KRAVITCH, Circuit Judges, and KAUFMAN*, Senior District Judge.
 FAY, Circuit Judge:
 
 
 1
 This diversity case presents us with a number of interesting questions. Relying on Florida's conflict of laws rules we must decide whether to apply the law of either California or Florida to the substantive issues. Appellants Shapiro and The California Club argue that California law should apply while appellee Associated International Insurance Company (Associated) encourages us to look to the substantive law of Florida. The substantive issue is whether the language used in Associated's umbrella insurance policy should be interpreted to provide primary coverage when the primary insurer becomes insolvent. Shapiro and The California Club contend that under California law, the secondary coverage "drops down" to primary coverage when the primary coverage becomes uncollectible due to the insolvency of the primary carrier. Associated urges that under either Florida or California law, the umbrella carrier does not "drop down" into the shoes of the primary carrier upon the primary carrier's insolvency. Finally, Associated argues that even if the court should find that the language of its excess policy requires "drop down" coverage, Shapiro's execution of a settlement agreement with The California Club absolving The California Club of any further liability to Shapiro and concomitantly assigning any of The California Club's rights to collect from Associated the remaining amount of the agreed judgment, relieves Associated of liability for such amount. For the reasons stated in this opinion, we AFFIRM the district court.
 
 BACKGROUND
 
 2
 Irving Shapiro, a resident of Illinois who maintained a residence in Florida, was injured on the premises of The California Club, Inc., in Florida on March 7, 1980. The California Club, Inc., was a Florida corporation controlled by Ceasars World, Inc. (Ceasars), another Florida corporation with its principal office in California.
 
 
 3
 At the time of Shapiro's injury, Ceasars was responsible for purchasing insurance for The California Club. Relying heavily on the expertise of Johnson & Higgins, a California insurance broker which sold Ceasars most, if not all, of its insurance, Ceasars purchased insurance from, among other insurers, Ambassador Insurance Company (Ambassador) and Associated, a California Corporation. Ambassador provided coverage for losses of up to one million dollars ($1,000,000) under a comprehensive general liability policy, and Associated provided umbrella coverage for losses up to ten million dollars ($10,000,000).
 
 
 4
 Following the accident, Shapiro, and his wife, sued The California Club to recover for the injuries they sustained. While this lawsuit was pending, The California Club's primary insurer, Ambassador, became insolvent. During the course of trial, the Shapiros and The California Club reached an agreement whereby a judgment in the amount of nine hundred fifty thousand dollars ($950,000) was entered in the Circuit Court in and for Dade County, Florida, on April 29, 1986. As part of the agreement, Ceasars paid two hundred thousand dollars ($200,000) to the Shapiros on behalf of The California Club in partial satisfaction of the judgment and assigned its rights, if any, against Associated concerning the seven hundred fifty thousand dollar ($750,000) balance. In exchange, the Shapiros agreed not to attempt to collect the seven hundred fifty thousand dollar ($750,000) balance of the judgment from The California Club or Ambassador.
 
 
 5
 The Shapiros and The California Club then filed separate lawsuits against Associated to recover under the Associated policy, alleging that the language contained in the Associated policy obligated Associated to "drop down" and provide primary coverage after Ambassador became insolvent.[1] After a bench trial, the district court ruled in the Shapiro case that "under Florida or California law, Defendant is not required to 'drop down' into the shoes of Ambassador." R3-71-3 (No. 89-5260). Likewise, based on its decision in the Shapiro case, the court entered a summary judgment, and subsequently a final judgment, in favor of Associated in The California Club case. R1-23, 24 (No. 89-5512). On appeal, Shapiro requests a reversal and remand with instructions to enter judgment in favor of Clara Shapiro in the amount of seven hundred fifty thousand dollars ($750,000) plus interest and attorneys' fees. The California Club requests a reversal and remand directing that the case be tried.
 
 DISCUSSION
 
 6
 This diversity case presents us with the difficult and unenviable task of adjudicating, according to state law, the rights of parties to an insurance contract. We embark on our expedition only hoping that our interpretation of state law is accurate. First, applying Florida's law regarding choice of law, we must determine whether to construe the Associated policy according to the substantive law of Florida or California. Second, we must determine whether the language contained in the Associated insurance policy obligates Associated to satisfy the judgment. More specifically, we are called upon to decide whether the uncollectibility of insurance under the primary Ambassador policy caused Associated's excess coverage to "drop down" and to provide primary coverage.
 
 Choice of Law
 
 7
 "The question of which state's substantive law applies in a case is a question of law entitled to independent review on appeal." American Family Life Assur. Co. v. United States Fire Co., 885 F.2d 826, 830 (11th Cir.1989). The district court, having obtained jurisdiction through diversity of citizenship, is bound to apply the substantive law of the state in which it is located. Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Keller v. Miami Herald Publishing Co., 778 F.2d 711, 714 (11th Cir.1985). This principle applies to a state's law regarding choice of laws. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (per curiam); American Family Life Assur. Co., 885 F.2d at 830. Thus, as a preliminary matter, we must determine which state's substantive law the Florida Supreme Court would choose to govern interpretation of the Associated policy, as we are "bound to decide the case the way it appears the state's highest court would." Towne Realty, Inc. v. Safeco Ins. Co. of America, 854 F.2d 1264, 1269 n. 5 (11th Cir.1988). The district court failed to rule on this issue, stating only that "under Florida or California law, Defendant is not required to 'drop down' into the shoes of Ambassador." R3-71-3 (No. 89-5260).[2] Although neither party thoroughly briefed the issue, Shapiro advocates application of the law of California while Associated contends that Florida law should apply.
 
 
 8
 After becoming acutely familiar with Florida's choice of law rules, we harbor uncertainty about the decision Florida's highest court would reach. However, absolute certainty is not required. "Although we are Erie -bound, we may exercise an option to make an educated guess as to how the Florida courts would resolve the issue." Smigiel v. Aetna Cas. & Sur. Co., 785 F.2d 922, 925 (11th Cir.1986) (citing Trail Builders Supply Co. v. Reagan, 409 F.2d 1059, 1061 (5th Cir.1969)).
 
 
 9
 The first problem we encounter is whether to characterize the case as a tort case or a contract case, for "different substantive issues in a single case may have to be resolved under the laws of different states where the choices influencing decisions differ." Foster v. United States, 768 F.2d 1278, 1281 (11th Cir.1985) (citing R. Leflar, American Conflicts Law, Sec. 3.4 p. 72 (2d ed. 1980)). Originally, this case was brought by the Shapiros alleging negligence on the part of The California Club; there would be little doubt that this is a tort action. Having settled the negligence action and having obtained an assignment of the California Club's rights against Associated, however, Shapiro now seeks a determination of the effect to be given the language of Associated's policy insuring the California Club. As the resolution of this issue depends upon the court's interpretation of policy language, Shapiro raises an issue sounding in contract. See Lumbermens Mut. Cas. Co. v. August, 530 So.2d 293, 295 (Fla.1988). Accordingly, we look to Florida's choice of law rules governing the interpretation of insurance contracts.
 
 
 10
 We begin our analysis with the archaic lex loci contractus rule. Traditionally, when confronted with questions regarding the interpretation and validity of a contract, Florida courts have applied the law of the state where the contract was made or to have been performed. Goodman v. Olsen, 305 So.2d 753, 755 (Fla.1974); Brown v. Case, 80 Fla. 703, 86 So. 684, 685 (1920). "Under the law of Florida, ... a contract is made at the place where the last act necessary to complete the contract is done." Jemco, Inc. v. United Parcel Service, Inc., 400 So.2d 499, 500 (Fla.Dist.Ct.App.1981), rev. denied, 412 So.2d 466 (Fla.1982); Lacy v. Force V Corp., 403 So.2d 1050, 1056 (Fla.Dist.Ct.App.1981); see also Ray-Hof Agencies, Inc. v. Petersen, 123 So.2d 251, 255 (Fla.1960) (place where contract made is place of performance in unilateral contract). Thus, under the traditional choice of law rule in Florida, we would apply the substantive law of California because the contract was issued and countersigned in California through a California broker.
 
 
 11
 We do not believe, however, that the Florida Supreme Court would apply the antiquated lex loci contractus rule to the instant case. Although the Florida Supreme Court extended "the lex loci contractus rule [to] determine[ ] the rights and risks of the parties to automobile insurance policies on the issue of coverage," August, 530 So.2d at 295; see Sturiano v. Brooks, 523 So.2d 1126, 1129-30 (Fla.1988), the court specifically limited its holding to contracts for automobile insurance, reasoning that we live in a migratory, transitory society and "[t]o allow one party to modify the contract simply by moving to another state would substantially restrict the power to enter into valid, binding, and stable contracts." Sturiano, 523 So.2d at 1129-30. Using the same reasoning, we believe that if faced with the facts of this case, the court would apply Florida law. While it is true that technological advancements encourage migration and transition, it is equally true that real property remains stationary and immobile. Unlike a contract for automobile insurance where the location of the insured risk can vary as readily and as quickly as an automobile can move, the Associated policy insured against occurrences at The California Club, a risk whose location was unchanging. Because in the case at bar the location of the insured risk was stable, any doubt concerning a party's ability to "restrict the power to enter into valid, binding, and stable contracts" is dispelled. Id.
 
 
 12
 Applying the principles of the Restatement (Second) leads us to the same conclusion. Section 193 of the Restatement (Second) of Conflicts of law states:
 
 
 13
 The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in Sec. 6 to the transaction and the parties, in which event the local law of the other state will be applied.
 
 
 14
 Restatement (Second) of Conflict of Laws Sec. 193 (1971). Section 193 encourages application of the local law of the state in which the insured risk is located. We recognize, however, that the Associated insurance policy was a comprehensive multiple risk policy covering insureds in numerous locations, including California, New Jersey, Nevada, and Florida. Consequently, "the location of the risk has less significance ... [because] the policy covers a group of risks that are scattered throughout two or more states." Restatement (Second) of Conflict of Laws Sec. 193 comment b. Comment f to section 193 addresses this issue:
 
 
 15
 Multiple risk policies. A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y, and Z. .... Presumably the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged ..., it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X.
 
 
 16
 Restatement (Second) of Conflict of Laws Sec. 193 comment f. Thus, although the risks covered under the Associated umbrella policy were spread out over several states, the Restatement advises application of the substantive law of the state in which each individual risk is located when adjudicating issues concerning that risk, treating the comprehensive policy effectively as several different policies. Since the case with which we are concerned arose out of an accident which occurred at The California Club in Florida, one of the insured premises under the Associated policy, the Restatement would have us apply Florida substantive law.
 
 
 17
 While we cannot know for certain whether the Florida Supreme Court would espouse these principles if faced with the case before us today, we surmise that it would. Florida courts have applied the Restatement to conflict of laws questions involving other areas of the law. For example, the Florida Supreme Court abandoned the antiquated lex loci delicti rule and adopted the "significant relationship" approach of the Restatement to control choice of law questions in tort actions. Bishop v. Florida Specialty Paint Co., 389 So.2d 999 (Fla.1980); Restatement (Second) of Conflict of Laws Sec. 145. Accordingly, Florida courts have used the approach of the Restatement to resolve choice of law issues involving contributory negligence,[3] statutes of limitations,[4] indispensable parties,[5] interspousal immunity,[6] and guest statutes.[7] Furthermore, the Supreme Court of Florida in Gillen v. United Servs. Auto. Ass'n, 300 So.2d 3 (Fla.1974), while neither explicitly adopting nor rejecting the Restatement (Second) approach to interpretation of automobile insurance contracts, determined that "Florida ha[d] a significant relationship to the insurance contract at issue," because, among other reasons, "the risk of the policy was centered in Florida and only minimal contact with New Hampshire existed in terms of actual risk." Id. at 6-7.[8] Likewise, in New Jersey Mfrs. Ins. Co. v. Woodward, 456 So.2d 552 (Fla.Dist.Ct.App.1984), the Third District Court of Appeal, in determining whether an insurance policy was subject to the Florida statutory requirement that uninsured motorist coverage limits be equal to the liability coverage limits, looked to where the risk of the automobile insurance policy was centered. Id. at 553-54; see also Andrews v. Continental Ins. Co., 444 So.2d 479, 482-83 (Fla.Dist.Ct.App.) (applying both lex loci contractus and Restatement (Second) of Conflict of Laws Sec. 193 to conclude that foreign law governs interpretation of automobile insurance policy), rev. denied, 451 So.2d 847 (Fla.1984). But see New Jersey Mfrs. Ins. Co. v. Robertazzi, 473 So.2d 235, 236 (Fla.Dist.Ct.App.1985) (automobile insurance case recognizing that Florida Supreme Court case adopting significant relationship test applies only to tort cases), rev. denied, 484 So.2d 9 (Fla.1986); Jemco, 400 So.2d at 501 n. 5 (recognizing that lex loci contractus applies to contract actions albeit tort actions governed by Restatement (Second)).
 
 
 18
 Additionally, we are impressed that a Florida court likely would reject application of California law because of the strong interest Florida displays in regulating insurance when the insured risk is located within the state. Florida's Insurance Code states: "No person shall transact insurance in this state, or relative to a subject of insurance resident, located, or to be performed in this state, without complying with the applicable provisions of this code." Fla.Stat.Ann. Sec. 624.11(1) (West 1984). The Code further provides:
 
 
 19
 No person shall act as an insurer, and no insurer or its agents, attorneys, subscribers, or representatives shall directly or indirectly transact insurance, in this state except as authorized by a subsisting certificate of authority issued to the insurer by the department, except as to such transactions as are expressly otherwise provided for in this code.
 
 
 20
 Fla.Stat.Ann. Sec. 624.401(1) (West 1984).[9] Such regulation of the insurance industry indicates that Florida has a significant interest in litigation involving insurance of risks permanently located in Florida, and further augurs that a Florida court would hesitate to defer to the law of another jurisdiction to control the substantive issues in this case.
 
 
 21
 Considering our traditional deference to local law in cases involving the adjudication of interests in real property, Xanadu of Cocoa Beach, Inc. v. Zetley, 822 F.2d 982, 985 (11th Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988); United States v. Denby, 522 F.2d 1358, 1362 (5th Cir.1975), and Florida's application of the law of the situs of the property in disputes centered on real property, Xanadu, 822 F.2d at 984-85; In Re Estate of Swanson, 397 So.2d 465, 466 (Fla.Dist.Ct.App.1981); Kyle v. Kyle, 128 So.2d 427, 429 (Fla.Dist.Ct.App.1961), cert. discharged, 139 So.2d 885 (Fla.1962), and considering Florida's trend toward application of the concepts advanced by the Restatement (Second) as well as the significance of Florida's interest in the outcome of this case, as evidenced by its diligent regulation of insurers, we hypothesize that the Florida Supreme Court would apply Florida law to this case. Consequently, we also will apply the law of Florida to the substantive issues presented.
 
 
 22
 Does Coverage Under the Associated Policy "Drop Down?"
 
 
 23
 The language in the Associated policy giving rise to the current controversy is as follows:
 
 
 24
 II. Limit of Liability--Retained Limits....
 
 
 25
 Each Occurrence--With respect to personal injury, property damage, or advertising liability, or any combination thereof, the Company's liability shall be only for the ultimate net loss in excess of the Insured's retained limits defined as the greater of:
 
 
 26
 (a) an amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule of Underlying Insurance hereof, plus applicable limits of any other underlying insurance collectible by the insured; or
 
 
 27
 (b) the amount specified in Item 5 of the Declarations as the result of any one occurrence not covered by the said insurance.
 
 
 28
 R1-1 (Exhibit B) (No. 89-5260). The Ambassador policy was listed in the Schedule of Underlying Insurance as providing one million dollars ($1,000,000) of comprehensive general liability coverage; no other underlying insurance has been shown to cover the Shapiro accident.
 
 
 29
 Shapiro argues that this clause clearly requires Associated to provide primary coverage in the event that the primary insurer becomes insolvent because the adjective "collectible" modifies both the insurance listed in the schedule and any other underlying insurance. Shapiro further argues that even if we do not adopt this as the indisputable interpretation, we must construe the clause most favorably to the insured because the phrase is ambiguous as it can be interpreted in two ways, either of which is reasonable. Associated argues that the trial judge correctly determined that the policy language is unambiguous and that Associated does not "drop down" into the shoes of Ambassador. Associated maintains that under the terms of the insurance policy, it is obligated to pay only those losses in excess of one million dollars ($1,000,000), because the Schedule of Underlying Insurance lists Ambassador as the primary carrier.
 
 
 30
 Construing language similar to that contained in the Associated policy, numerous courts have addressed the issue of whether an excess insurer has an obligation to provide primary coverage when the primary insurer becomes insolvent. For example, in a recent case before the United States District Court for the Eastern District of Louisiana, the court was requested to interpret a clause nearly identical to the clause at issue in this suit. See McGlynn v. Salen Protexa Drilling Co., Civil Action No. 85-146, 1988 WL 70108 (E.D.La. June 30, 1988) (Lexis, Genfed library, Dist. file).[10] After finding that "federal and California law embrace the same general principles of insurance contract construction and interpretation," the court held that "[t]he limitation language in the ... policy does not require nor does it imply that the listed primary insurance ... be collectable in order to be counted as part of the Insured's retained limit." Id. Likewise, as a result of its interpretation of essentially the same language as is contained in the Associated policy, the Fifth Circuit concluded
 
 
 31
 that the quoted language admits of only one reasonable interpretation: It plainly contemplates two types of underlying insurance, scheduled and non-scheduled. Each appears in a distinct phrase, as is evidenced by the use of a comma between the words "hereof" and "plus" and by the use of the word "plus" itself. The most natural reading of the language is therefore to read the two phrases separately, with the collectibility requirement being confined to the second phrase. With the policy so construed, only nonscheduled underlying insurance need be collectible to be included in the calculation of the insured's retained limit; the limits of scheduled underlying insurance ... is included regardless of whether the insured can actually collect on the policy.
 
 
 32
 Transco Exploration Co. v. Pacific Employers Ins. Co., 869 F.2d 862, 864 (5th Cir.1989); see also Continental Marble & Granite v. Canal Ins. Co., 785 F.2d 1258, 1259 (5th Cir.1986) ("Imposing the duty of indemnification on [the secondary insurer] would, in effect, transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might choose."). Other courts have held that such language does not impose an obligation on the secondary insurer to provide coverage in the event that the primary insurer becomes insolvent. Zurich Ins. Co. v. Heil Co., 815 F.2d 1122, 1124-26 (7th Cir.1987); Radiator Specialty Co. v. First State Ins. Co., 651 F.Supp. 439, 441-43 (W.D.N.C.1987), aff'd, 836 F.2d 193 (4th Cir.1987); United States Fire Ins. Co. v. Capitol Ford Truck Sales, Inc., 257 Ga. 77, 355 S.E.2d 428, 432-33 (1987); Value City, Inc. v. Integrity Ins. Co., 30 Ohio App.3d 274, 508 N.E.2d 184, 187-89 (1986).
 
 
 33
 Conversely, some courts have required secondary insurers to "drop down" and provide primary coverage as a result of the primary insurer's insolvency. For example, in Poirrier v. Cajun Insulation, Inc., 501 So.2d 800 (La.Ct.App.1986), writ denied, 502 So.2d 579 (La.1987), Louisiana's Fourth Circuit Court of Appeal concluded "that the use of the phrase 'any other' in reference to 'underlying collectible insurance' means that [the scheduled insurance] along with any other underlying insurance retained by Cajun must be collectible." Id. at 807-08; see also Geerdes v. St. Paul Fire & Marine Ins. Co., 128 Mich.App. 730, 341 N.W.2d 195, 197 (1983) (Because of use of the word "other," the court found that the clause clearly and unambiguously obligated secondary insurer to provide primary coverage in the event of insolvency of the primary insurer.). The Louisiana court additionally found that the policy language was ambiguous "insofar as it define[d the excess insurer's] liability for loss in excess of the limits of 'the underlying insurance listed in Schedule A ..., plus the applicable limits of any other underlying insurance collectible by the insured,' " and that such ambiguity was evidenced by the panel's disagreement as to the appropriate interpretation of the policy language. Poirrier, 501 So.2d at 808. The court consequently employed the rule of construction that all ambiguities are to be construed against the insurer to impose liability on the secondary insurer. Id.
 
 
 34
 We do not wish, nor are we compelled to engage in semantics. Our responsibility is to interpret the contract according to the laws of Florida. In so doing, we are "bound by a decision of a Florida District Court of Appeal on questions of Florida state law, absent a strong showing that the Florida Supreme Court would decide the issue differently." Maseda v. Honda Motor Co., 861 F.2d 1248, 1257 n. 14 (11th Cir.1988) (citing Bailey v. Southern Pac. Transp. Co., 613 F.2d 1385, 1388 (5th Cir.1980); see Floyd v. Eastern Airlines, Inc., 872 F.2d 1462, 1466-67 (11th Cir.1989). Since we neither are aware nor have been apprised of any authority to the contrary, we must follow the rule recognized by the Third District Court of Appeal "that ... the collectibility of primary insurance is to be determined as of the date of the occurrence fixing liability." Golden Isles Hosp., Inc. v. Continental Cas. Co., 327 So.2d 789, 790 (Fla.Dist.Ct.App.1976).
 
 
 35
 Applying the Golden Isles rule, we hold that Associated is not obligated to pay the remaining $750,000 of the judgment. According to the Shapiros' complaint and The California Club's amended complaint, Irving Shapiro was injured on March 7, 1980. R1-1 (Nos. 89-5260 & 89-5512). Ambassador did not become insolvent until 1982, after the Shapiros' filed suit against The California Club. Id. Consequently, we are spared from the undesirable task of determining whether the term "collectible" applies to both the listed and unlisted policies, because the primary insurance provided by Ambassador was collectible at the time Irving Shapiro was injured.
 
 CONCLUSION
 
 36
 Applying Florida's conflict of laws rules, we find that the Florida Supreme Court would likely apply its own law to the substantive issues at bar. According to the law of Florida, the collectibility of primary insurance is to be determined at the time of the event fixing liability. Consequently, Associated is not liable under Florida law because the primary insurance was collectible when Shapiro was injured. Since, we hold in favor of Associated on these issues, we need not address the remaining issue of whether the settlement agreement itself absolved Associated of liability. We find no reversible error in the district court's judgment in favor of Associated in both the Shapiro and The California Club cases.
 
 
 37
 The judgment is AFFIRMED.
 
 
 
 *
 Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 Associated moved to consolidate the lawsuit filed by the Shapiros and the lawsuit filed by The California Club. R2-58 (No. 89-5260). Associated's motion, however, was denied. On appeal, The California Club has adopted the brief of Shapiro. Thus, for purposes of this opinion, any references to arguments raised by Shapiro necessarily implies that The California Club raised the same arguments. Likewise, any ruling with respect to Shapiro applies equally to The California Club, unless otherwise stated
 
 
 [2]
 We recognize that choice of law questions can be avoided if the laws of the different jurisdictions lead to identical results. See Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1388 n. 17 (11th Cir.1988); Barrett v. Prudential Property and Cas. Ins. Co., 790 F.2d 842, 844 (11th Cir.1986). Even if the result in this case is the same under either California or Florida law, however, we consider it necessary to decide which law to apply for purposes of analytical discussion of the substantive issues
 
 
 [3]
 State Farm Mut. Auto. Ins. Co. v. Olsen, 406 So.2d 1109, 1110-11 (Fla.1981)
 
 
 [4]
 Bates v. Cook, 509 So.2d 1112, 1114-15 (Fla.1987)
 
 
 [5]
 Hertz Corp. v. Piccolo, 453 So.2d 12, 14-15 (Fla.1984)
 
 
 [6]
 Pennington v. Dye, 456 So.2d 507, 509-10 (Fla.Dist.Ct.App.1984)
 
 
 [7]
 AIU Ins. Co. v. Reese, 498 So.2d 966 (Fla.Dist.Ct.App.1986), rev. denied, 509 So.2d 1118 (Fla.1987)
 
 
 [8]
 We note that insofar as the Gillen court evaluated the significance of Florida's relationship to the contract of insurance, it was applying the Restatement (Second) to the choice of law issue. The court's ultimate decision to apply Florida law, however, was based on public policy grounds and not the Restatement. 300 So.2d at 7
 
 
 [9]
 We cite these statutory provisions not to determine whether Associated was required to comply, but rather to exemplify the strong interest Florida displays in regulating and restricting the activities of insurers indemnifying subjects within the state
 
 
 [10]
 The clause reads:
 With respect to personal injury, property damage or advertising injury, or any combination thereof, PEIC's liability shall be only for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:
 (a) an amount equal to the limits of liability indicated beside the underlying insurance listed in schedule A hereof, plus the applicable limits of any other underlying insurance collectable by the Insured; or
 (b) the amount specified in Item 3 of the limits of liability section of the declarations....
 McGlynn, Civil Action No. 85-146 (E.D.La. June 30, 1988).