**WASTE CORPORATION OF AMERICA, INC. a foreign corporation, Plaintiff,**

v.

**GENESIS INSURANCE COMPANY, a foreign corporation, Defendant.**

No. 03–61480.

United States District Court, S.D. Florida, Miami Division.

Aug. 5, 2005.

Albert L. Frevola, Jr., John R. Hargrove, Gordon Hargrove & James, Fort Lauderdale, FL, Adam S. Chotiner, Shapiro Blasi & Wasserman, Boca Raton, FL, for Plaintiff.

James Miller Kaplan, William Zeena, Jr., Wilson Elser Moskowitz Edelman & Dicker, Miami, FL, Jason P. Cronic, Daniel J. Standish, Cara Tseng Duffield, Wiley Rein & Fielding, Washington, DC, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KLEIN, United States Magistrate Judge.

This matter comes before the Court upon Plaintiff's and Defendant's cross-motions for Summary Judgment (**D.E. No.s 90 and 96.**) For the reasons discussed below, Defendant's Motion for Summary Judgment is **GRANTED,** and Plaintiff's Motion for Summary Judgment is **DENIED**.

### THE DISPUTE

This matter involves an insurance coverage dispute arising out of a lawsuit in which the insured, WCA, paid $2 million to Kerry McNamara in a settlement following a $3 million jury verdict in favor of McNamara against WCA. To understand the

present controversy, a description of the underlying litigation is necessary.

## THE UNDERLYING LITIGATION

In March of 1999, WCA purchased the stock of two Florida companies from Kerry McNamara, Francisco Leon, and Phil DeStaven. The Stock Purchase Agreement ("the Agreement") contained several key provisions: WCA was to make an initial payment of $150,000 at the time of closing, followed by a series of later royalty and earnout payments based on formulas tied to the acquired companies' performance over a three year period. The sellers would each receive one-third of the payouts, and all three were to remain as employees and manage day-to-day operations.

In September, 2000, McNamara, Leon, and DeStaven filed suit against WCA, alleging that WCA had breached the Agreement by failing to allow Leon and McNamara to operate the two companies in a reasonable and prudent manner as required by the Agreement, by WCA operating the companies improperly, and by improperly charging amounts against the earnout calculations, thereby reducing the payments to the three sellers. The Plaintiffs' Third Amended Complaint included counts for breach of contract, fraud, and negligent misrepresentation.

Subsequently, DeStaven settled his portion of the lawsuit with WCA, and received a contingent stream of royalty payments that ultimately totaled $156,081.15. Several months later, Leon settled with WCA under the same terms as DeStaven, for a like amount.

McNamara proceeded to trial on his claim. During the trial, the judge dismissed all of McNamara's counts except for the claim of third party beneficiary breach of contract against WCA, based on the Agreement. The jury returned a verdict of $3 million for McNamara on the breach of contract claim. After post-trial mediation, WCA settled with McNamara by paying him $2 million. WCA now claims it is entitled to be paid $1,843,918.90 ($2 million less $156,081.10) by Genesis under a directors and officers liability policy issued by Genesis to WCA.

*The Insurance Policy:*

The terms of the Genesis policy issued to WCA provide in pertinent part: .

SECTION I. INSURING AGREEMENTS

A. The Insurer will pay, on behalf of the Directors and Officers, Loss arising from Claims . . . against the Director or Officers, individually or collectively, for a Wrongful Act. . . .

B. The Insurer will pay, on behalf of the Company, Loss which the Company is required to indemnify, or which the Company may legally indemnify, the Directors or Officers, . . . for a Wrongful Act; and

C. The Insurer will pay, on behalf of the Company, Loss arising from Securities Claims . . . for a Wrongful Act.

SECTION II. DEFINITIONS

F. "Loss" shall mean any amounts which the Directors or Officers are legally obligated to pay, such amounts which the Company is required to indemnify the Directors and Officers, or such amounts which the Company may legally indemnify the Directors or Officers, for Claims made against the Directors or Officers, or any amounts which the Company is legally obligated to pay for Securities Claims made against the Company . . . including damages, judgements, Settlements, and Defense Costs; provided, however, Loss shall not include . . . any matter which may be deemed uninsurable under the

law pursuant to which this Policy shall be construed.

\* \* \* \* \* \*

I. "Securities Claim" means any Claim brought by any person or entity, directly or derivatively, based upon, arising out of, or attributable to, the purchase or sale, or offer to purchase or sell, any securities of the Company. . . .

\* \* \* \* \* \*

L. "Wrongful Act" shall mean:

(1) under Insuring Agreements Sections I.A. and B., any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty by the Directors or Officers . . . .

(2) under Insuring Agreement Section I.C., any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty by the Company, or by persons for whose actual or alleged conduct the Company is legally responsible.

### Summary of the Respective Positions of the Parties:

WCA initially made claims under the policy for payments made by it to all three sellers. It later abandoned its claims relating to DeStaven and Leon, stating that they received only what they were entitled to under the Agreement and therefore have no claims under the policy. WCA now seeks only to be reimbursed for a portion of what it paid to McNamara. In that regard, it concedes a reduction of $156,086.10 to the $2 million paid by it, stating that the $1,843,918.90 represents the excess over the contractual amount due to McNamara. This excess, it claims, is not a contractual liability, and is therefore covered under the policy.

WCA contends that it suffered a loss resulting from a wrongful act arising out of a securities claim. Even though the origin of the claim derived from a contract, the language of the policy is broad enough to cover contract claims. Moreover, the policy contains no exclusions for claims based on breach of contract. WCA further argues that the "wrongful act" in which it engaged (as found by the jury) was mismanagement of the acquired companies, which constituted a breach of its duties owed under the stock purchase agreement, as distinguished from its contractual obligations under the policy. When WCA was required to pay an amount to McNamara in excess of its obligations under the Agreement, it suffered a covered "loss." This excess amount, it maintains, distinguishes the amount from the settlements with DeStaven and Leon, both of whom received only what they were entitled to under the Agreement.

Genesis maintains that the insuring agreement does not cover breaches of contract. The policy is one of liability insurance, not indemnity, and thus covers fortuitous events, not acts within the insured's control. A breach of contract is within the control of the insured. Since the insuring agreement does not grant coverage for breaches of contract, there is no need to delineate a breach of contract as an exclusion. The mere fact of providing coverage based on securities claims does not mean such claims automatically include acts consisting of breaches of contract; not all securities claims are breach of contract claims, and the policy still provides coverage for a variety of securities claims, including fraud, negligence or other putative claims.

Nor, Genesis argues, is it appropriate to read breach of contract claims into an otherwise unambiguous insuring agreement. Covering such claims is against public policy, because it would allow the insured to activate coverage based on actions which are totally within its control.

Finally, Genesis argues that WCA's decision to seek only the "excess" of what

was paid to McNamara, while abandoning the DeStaven and Leon claims concedes that breach of contract claims are not covered under the policy. By dropping the DeStaven and Leon claims because they received only what there were entitled to under the stock purchase agreement, WCA admits there is no coverage for such claims. The same is true for the reduction of the McNamara claim. As for the "excess," the only claim that went to the jury in the underlying litigation was a breach of contact claim, and the jury decided WCA was liable to McNamara for its breach of the stock purchase agreement. WCA now cannot seek to parse that decision by claiming a portion of it was based in tort. The lack of a liquidated sum does not vitiate the finding by the jury that McNamara suffered contractual expectation damages under the Agreement.

The parties initially agreed that the insurance policy may be construed under either Texas or Florida law, but the result would be same under the law of either state. In a supplemental filing, WCA now asserts that Florida law applies, citing to *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119–21 (11th Cir.1990). (D.E. No. 127). Genesis, in its own supplemental filing (D.E. No. 126), provided authority to support the position that Florida law may apply, citing *Shapiro, supra*, or that Texas law applies, citing *Wackenhut Services, Inc. v. National Union Fire Ins. Co.*, 15 F.Supp.2d 1314 (S.D.Fla.1998). However, because the result would be the same under the law of either state, the issue need not be discussed.

## LEGAL STANDARD

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Maniccia v. Brown*, 171 F.3d 1364, 1367 (11th Cir. 1999). The movant bears the initial responsibility of informing the Court of the basis for its motion and of identifying those materials which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In response to a properly supported motion for summary judgment, "the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts which show a genuine issue for trial." Fed.R.Civ.P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the Court must enter summary judgment for the moving party. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552. The Court, however, must view the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Maniccia*, 171 F.3d at 1367.

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis added). The Court may not resolve factual issues, but may only determine whether factual issues exist. A material fact is one which "might affect the outcome of the suit under the governing law. ..." *Id.* at 248, 106 S.Ct. at 2510. The Court's inquiry therefore is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. The parties agree,

and the Court concurs that there are no material factual issues, and that the sole question is one of law, i.e., the interpretation of the insurance policy in question.

## DISCUSSION

The starting point in deciding a coverage question is the insuring agreement. The insuring agreement here does not specifically cover breaches of contract. Florida and Texas courts follow essentially the same rules of construction in regard to unambiguous insurance policies:

> An insurance policy should be construed in its entirety, and, if reasonably possible, given the construction which reflects the intent of the parties.... When the language of a policy is unclear or confusing, the language should be construed against the insurer.... However, if the language of a policy is clear and unambiguous, it should be accorded its natural meaning.... The policy of strict construction against the insurer should not be used to add meaning to clear and unambiguous language.

*Landress Auto Wrecking Co. v. United States Fidelity & Guaranty Co.*, 696 F.2d 1290, 1291–1292 (11th Cir.1983)(internal citations omitted).

> In Texas, the rules of construction of contracts generally are applicable to insurance policies.... The court construes the contract of the insurance policy as a whole and gives effect to the intent of the parties as expressed in the instrument.... If there is no ambiguity found by the court, it must interpret the meaning and intent of the insurance policy from the four corners of the document without the aid of extrinsic evidence.

*Nutmeg Ins. Co. v. Clear Lake City Water Auth.*, 229 F.Supp.2d 668, 674 (D.Tex.2002)(internal citations omitted).

The policy at issue here is a liability insurance policy, not an indemnity policy. Generally, liability policies do not cover breach of contract damages, instead providing coverage for unforeseen events, not those within the insured's control. *Nutmeg Ins. Co., supra* at 695 ("liability policies do not cover intentional breach of contract ... the purpose of insurance is to protect insureds against unknown, or fortuitous, risks."); *Am States Ins. Co. v. Pioneer Elec. Co.*, 85 F.Supp.2d 1337, 1343 (S.D.Fla.2000)(insured's failure to maintain workers compensation insurance was not an "accident," but instead was a breach of contractual obligations; *Sec. Ins. Group v. Wilkinson*, 297 So.2d 113, 114 (Fla. 2d DCA 1974)(liability policy could not be construed to "provide indemnity for all damages due to non-performance").

Notwithstanding the lack of ambiguity, the threshold question is whether claims based on breaches of contract should be read into the insuring agreement, despite the absence of such a coverage clause, based on the policy's definition of "loss," the requirement of a "wrongful act," and public policy considerations.

As an initial observation, as pointed out in Holmes' Appleman on Insurance,

> [e]ven in the absence of an express exclusion, courts have held that a claim alleging breach of contract is not covered under a professional liability policy because there is no "wrongful act" and no "loss" since the insured is simply being required to pay an amount it agreed to pay.

Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 146.6 (2003).

### *Public Policy:*

■ Deciding whether to read breach of contract coverage into the insuring agreement should be determined against the backdrop of the strong public policy against insuring such breaches. There is good reason for the general prohibition. Allowing an insured to control whether it will be covered for its act of breaching a

contract places the insured in the unique posture of voluntarily choosing to do some act for which he knows an insurance company will compensate him even if he chooses wrongly. Who wouldn't buy insurance if he could decide whether to perform or decline to perform some act which would give him coverage for that action? Such a premise eliminates all risk to a potential insured. He could enter into a contract safe in the assumption that if he later decides to engage in an act which might be considered a breach, the insurance company will step forward to cover the consequences of his act if he was wrong; and if he was right, he still walks away with no consequence to himself. Such a practice is inimical to the entire concept of insurance. As Judge Posner noted in *May Dept. Stores Co. v. Fed. Ins. Co.*, 305 F.3d 597 (7th Cir.2002) at 601:

> It would be passing strange for an insurance company to insure a pension plan ... against an underpayment of benefits ... because of the acute moral hazard problem that such coverage would create... Such insurance would give the plan and its sponsor an incentive to adopt aggressive (just short of willful) interpretations of ERISA designed to minimize the benefits due, safe in the belief that if, as would be likely, the interpretations were rejected by the courts, the insurance company would pick up the tab. Heads I win, tails you lose.

There would be nothing to stop an insured from trying his hand and betting all his chips on a breach if he could be assured that the consequences of such an act had no impact on him.

There are numerous cases which are to the same effect. In *Pacific Ins. Co. Ltd. v. Eaton Vance Mgt.*, 369 F.3d 584 (1st Cir.2004) the court, quoting from *Baylor Heating & Air Conditioning Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415 (7th Cir.1993), stated at 593: [1]

> Under [the employer's] logic any default arising from a mistaken assumption regarding one's contractual liability could be transformed into an insured event. Indeed, ever refusing to pay a debt in reliance upon erroneous advice of counsel would convert a contractual debt into damage arising from a negligent omission. We dare not imagine the creative legal theories treading just short of malpractice and frivolity that could seek to transform contractual obligations into insured events.

Texas and Florida courts have voiced similar expressions of their public policy. *Nutmeg Ins. Co., supra* at 695; *Am. States Ins. Co., supra* at 1343. The restrictions stem from the general prohibition against permitting insurance to cover intentional conduct. In *Roman Catholic Diocese of Dallas v. Interstate Fire & Cas. Co.*, 133 S.W.3d 887 (Tex.Ct.App.2004), the court pointed out at 896, that "[p]ublic policy prohibits allowing a person from insuring against his intentional misconduct." In *Wessinger v. Fire Ins. Exch.*, 949 S.W.2d 834 (Tex.Ct.App.1997) the court stated at 840 that

> Texas public policy, too, "prohibits permitting an insured to benefit from his own wrongdoing. 'It is axiomatic in the insurance industry that one should not

---

1. Although it might be argued that the policy provisions in *Baylor* more explicitly excluded breach of contract, i.e., providing coverage only for "any negligent act, error or omission," the logic of the statement nevertheless obtains. Moreover, the *Eaton Vance* policy contained no such limitation, and instead provided coverage for "failure to discharge ... duties ... or, by reason of any actual or alleged breach of fiduciary responsibility ...." The *Eaton Vance* language is more closely analogous to the coverage language in the policy in the case at bar.

be able to insure against one's own intentional misconduct.' . . . The rationale behind the public policy is that the insured is more likely to engage in behavior which is harmful to society if he believes he will not have to bear the financial costs of his intentional indiscretions."

Florida expresses its public policy somewhat differently, allowing coverage in some instances for intentional acts, and disallowing it for others. The leading case in Florida is *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So.2d 1005 (Fla.1989), in which the Court noted at 1007:

> It is axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct. . . . The rationale underlying this rule is that the availability of insurance will directly stimulate the intentional wrongdoer to violate the law.

In *Ranger*, which involved a question of whether a claim based on intentional religious discrimination was an insurable event, the court adopted a two-prong test for determining whether intentional misconduct could ever be insured against: First, what was the conduct of the insured; was it of a type that would be encouraged by insurance? Second, what is the purpose served by imposing liability for the conduct; is it to deter wrongdoers or compensate victims? If the primary purpose is to deter wrongdoers, then indemnifying the intentional actor should not be the paramount consideration.

▮ Although a failure to satisfy either prong enunciated in *Ranger* is sufficient to abrogate coverage, WCA's claim fails both tests. First, allowing one to insure against a breach of contract would surely encourage parties to voluntarily abandon performance with little or no consequence. It

requires little clairvoyance to foresee how a party who enters into what turns out to be a bad bargain might choose to act if he knows he will be covered regardless of the choice and regardless of the outcome of the choice. It wouldn't even require a bad bargain; if he can see a better potential by refusing to perform, why not give it a try?

In addition, a claim based on breach of contract fails the second *Ranger* test as well. The prohibition against insuring such conduct does not implicate protecting the rights of victims of such intentional conduct, as it does in the ordinary tort context. Instead, the primary purpose of imposing liability for breaches of contract is to deter wrongdoers; that is, to prevent them from deciding to breach a commercial contract. The "victims" of such breaches do not need the same protection as the victim of an intentional tort needs. Therefore public policy bars coverage for such an act. To decide otherwise, and hold that insurance against contract breaches is really for the benefit of the injured victims of such breaches would render the *Ranger* test meaningless; if breach of contract insurance is really for the benefit of contract victims, then every act that ever has a consequence to another person qualifies for coverage as well. *Ranger* never intended such a result.[2]

Notwithstanding the foregoing, the question of coverage still must be decided on the basis of the policy provisions. The public policy prohibition merely provides the framework for deciding whether the policy requirements of "loss" and "wrongful act" have been established.

### The "Loss" and "Wrongful Act" Requirements:

For Genesis to be liable under the policy, the insuring agreement requires a loss

---

**2.** In *Travelers Indem. Co. v. PCR Inc.*, 889 So.2d 779 (Fla.2004) the court reiterated the rule at 794 that "one should not be able to insure against one's own intentional conduct," and again applied the two-part *Ranger* test.

arising from a securities claim as a result of a wrongful act. This policy defines loss as any amount which the insured is "legally obligated to pay" for any securities claim. The "loss" definition also says "Loss shall not include ... any matter which may be uninsurable under the law pursuant to which this Policy shall be construed." The definitions of "loss," "legally obligated to pay," and "wrongful act" must be culled from cases construing the terms under analogous circumstances.

In *Data Specialties, Inc. v. Transcontinental Ins. Co.,* 125 F.3d 909 (5th Cir. 1997), the court was faced with an insurance clause in a comprehensive general liability (CGL) policy which required the insurer to pay sums which the insured was "legally obligated to pay as damages" because of bodily injury or property damage. In that case, DSI, the insured electrical contractor had installed a switchboard which exploded. DSI made repairs, and then sought reimbursement of its expenses from its insurer. Applying Texas law, the court gathered cases construing the term "legally obligated to pay as damages," and concluded at 913:

> If Texas courts look to the law of other states, we conclude they would find that the insured must be liable for damages arising from its own tortious conduct to trigger liability insurance coverage. A breach of contract action does not fall within CGL coverage.

> In an Erie analysis, courts also rely on treatises to elicit a general rule on the issue. Various insurance commentators provide a uniform reading of the phrase "legally obligated to pay as damages." For example, Windt notes that many courts have held that the phrase refers to liability imposed by law for torts and not to damages for breach of contract. Another commentator, Long, further describes the phrase in question in a general liability insurance policy as one that "does not recompense the insured for

his own loss." He states that "liability insurance protects the insured against damages which he may be liable to pay by virtue of his own actions." In discussing liability insurance, an authoritative publication explains that coverage exists when "the insured's liability is attributable to his own negligence...."

Although *Data Specialties* involved a general liability policy, and the instant policy involves directors' and officers' liability, there is no reason to believe that the same reasoning and logic would not also apply here. Both types of policy are based on liability, and not indemnity, and liability insurance concepts apply to both.

Similarly, in *Cincinnati Ins. Co. v. Metropolitan Properties, Inc.,* 806 F.2d 1541 (11th Cir.1986), the insurer issued a multi-peril policy which covered Metropolitan for "any claim made against the insured and caused by any negligent act, error or omission of the insured." The policy, like the one here, was silent as to claims based on breach of contract. Metropolitan had failed to acquire, clean and develop certain property which it had agreed with the City of Birmingham to obtain. The City sued Metropolitan, which in turn sought coverage of the claim from its insurer, Cincinnati. The insurer filed an action for declaratory relief, contending that its policy did not provide coverage for breach of contract, and that Metropolitan's claim was just that. The court held that the action was in reality one for breach of contract, and therefore fell outside the insuring language.

■ A more congruent template is provided by *American Cas. Co. of Reading, Pa., v. Hotel and Restaurant Employees and Bartenders Int'l Union Welfare Fund,* 113 Nev. 764, 942 P.2d 172 (1997), in which the insurance policy defined "wrongful acts" to include "any actual or alleged error or misstatement or misleading state-

ment or act or omissions or neglect or breach of duty by the Insureds in the discharge of their duties...." [3] The policy further provided coverage for intentional acts not amounting to a crime. The trustees of a union welfare fund were sued for breach of their fiduciary duties in failing to fund the plan in accordance with their agreement to do so. After a judgment was rendered against the trustees, they sought reimbursement form their insurer. In holding the policy did not provide coverage, the court stated at 176–177:

> The international trustees were required to pay their contractual obligation. This contractual obligation did not result from their wrongful act of refusing to satisfy it. To hold otherwise would allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them. The refusal to pay an obligation simply is not the cause of the obligation, and the international trustees' wrongful act in this case did not result in their obligation to pay; their contract imposed on them the obligation to pay.

Similarly, the insuring agreement in *Eaton Vance Management, supra*, involving an errors and omissions policy, provided the following coverage: for

> [l]oss or liability incurred by [Eaton Vance] ... by reason of any actual or alleged failure to discharge his or its duties or to act prudently within the meaning of ... [ERISA] ..., or by reason of any actual or alleged breach of fiduciary responsibility within the meaning of said Act ....

*Id.* at 587. Eaton Vance failed to fund an employee profit-sharing plan as required by its agreement to do so. It then sought reimbursement from its insurer. In finding coverage did not exist for the claim,

the court, quoting from *American Cas. Co. of Reading, Pa., supra*, stated at 590:

> [ ] The refusal to pay an obligation simply is not the cause of the obligation, and the [insured's] wrongful act [consisting of another independent act] in this case did not result in their obligation to pay; [its] contract imposed on [it] the obligation to pay [ ].

The court held the acts of failing to fund were not covered by the policy, stating that one could not transform a default arising out of a contractual liability into an insured event.

### Plaintiff's Cases Are Distinguishable:

The Plaintiff relies on several cases which it claims strongly support its position. First, it cites to *Vandenberg v. The Superior Court*, 21 Cal.4th 815, 88 Cal. Rptr.2d 366, 982 P.2d 229 (1999) for the proposition that the distinction between coverage for tort actions and non-coverage for contract actions is an artificial one; the court should look to the nature of the damage and the risk instead of the label of the claims to decide whether coverage should exist. In adopting this position, the California Supreme Court overruled a long line of cases in its own state. Neither Florida nor Texas has adopted the California position, and there is nothing to indicate that they would be inclined to do so. Courts in other jurisdictions continue to adhere to the distinction in rejecting coverage for claims based on breach of contract. *See*, e.g., *American States Ins. Co. v. Powers*, 262 F.Supp.2d 1245 (D.Kan. 2003); *Keystone Filler & Mfg. Co., Inc. v. American Mining Ins. Co.* 179 F.Supp.2d 432 (M.D.Pa.2002)(rejecting *Vandenberg* analysis and finding tort/contract distinc-

---

**3.** This definition is virtually identical to the one at bar, which defines "wrongful act" as "any actual or alleged act, omission, misstate-ment, or misleading statement, neglect, error or breach of duty...."

tion valid). Thus, *Vandenberg* is inapplicable.

Next WCA relies on *Int'l Ins. Co. v. Johns,* 874 F.2d 1447 (11th Cir.1989). In *Johns,* a shareholder sued a company and its officers and directors to invalidate golden parachutes given to the officers and directors, alleging corporate waste. The shareholder's suit was settled with the officers and directors returning some of their compensation to the company. They in turn sought reimbursement from International, which had issued an officers and directors liability policy to them. The court held those facts sufficient to constitute a loss under the policy, and the officers and directors were entitled to reimbursement.

The Plaintiff contends that *Johns* stands for the proposition that a breach of contract may constitute a "loss" and/or a "wrongful act" for which coverage is afforded under an officers and directors policy. But *Johns* is clearly distinguishable, and in a close analysis, inapposite. In *Johns,* the insureds (the officers and directors) did not voluntarily decide to breach their contracts and then sue for coverage. In fact, they fought to maintain their contracts in the face of allegations by a third party that they constituted corporate waste. Thus, the rationale which precludes coverage for an insured who decides to breach his contract in the belief that he may do so with impunity are simply not present.

Moreover, the fact that *Johns* had its origins in a contract does not mechanically turn the claim into one for breach of contract. The nature of the underlying action in *Johns* amply demonstrates this prescript. Moreover, this principle is further illustrated by *Admiral Ins. Co. v. Briggs,* 264 F.Supp.2d 460 (N.D.Tex.2003), another case relied upon by Plaintiff. In *Admiral,* the insurer issued an officers and directors policy which had a specific contract exclusion. The insured's landlord, CB Parkway, took stock instead of cash for rent, from CPT, the named insured. When the stock became worthless, CB Parkway sued, claiming the officers and directors made misrepresentations about the future success of CPT to induce the landlord to accept stock instead of cash. CPT and the individuals sought coverage, and the insurer invoked the contract exclusion. In rejecting the insurer's position, the court stated at 463:

> The CB Parkway case is not based upon nor does it arise out of the lease contract.... The lease contract did not cause the stock fraud claim, it simply provided the context in which the stock fraud took place.

Thus, contrary to Plaintiff's assertions, the fact that there may have been an underlying contract which gave rise to coverable events, does not automatically mean that all matters which had their genesis in a contract will transform breaches of contract into covered events. Again, as the *Admiral* court stated at 462:

> Admiral's interpretation of this contract exclusion provision is overly broad. Its interpretation would exclude coverage under the Policy for all stock fraud claims because they all involve a contract for the sale of stock.[4]

The final case relied upon by Plaintiff is *Venture Encoding Serv. Inc. v. Atlantic Mut. Ins. Co.,* 107 S.W.3d 729 (Tex.App. 2003). A printing company with an errors and omissions policy sought to recover the cost of reprinting coupon books after it

---

**4.** This also disposes of Plaintiff's claim that the insurance policy is illusory if it does not cover breaches of contract, since every such claim necessarily has its roots in the stock purchase agreement. There are many other claims which still exist, e.g., stock fraud, and under the *Ranger* two part test, such claims would enjoy coverage.

discovered a mistake it made in return addresses for payments. The insurer denied coverage based on breach of contract by the printing company. The court rejected the defense, noting that an errors and omissions policy provides specialized coverage designed to protect members of a particular group from "liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the professions." *Id.* at 736.

Although the *Venture Encoding* court spoke in terms of the Plaintiff breaching its contract, it pointed out that the policy in question had as its purpose the protection against specific business risks, i.e. printer mistakes. The Court stated at 737:

> In appellant's second issue it asks whether the costs incurred in correcting a printing error to fulfill a contractual obligation are covered sums for which an insured is "legally obligated to pay." The opening paragraph of the Printers E & O Policy limits coverage to "those sums that the insured becomes legally obligated to pay as damages arising out of any negligent act, error or omission" while providing printing services.
>
> A review of the appellant's agreement with Sallie Mae shows that appellant was contractually obligated to meet certain quality control standards, including replacement of any defective coupon books within forty-eight hours of notification. Under paragraph 6.1 of their agreement any corrective action the appellant took was to be at its expense and "at no additional charge to Sallie Mae Servicing." Also, paragraph 6.2 of the Sallie Mae Agreement obligated appellant to pay any costs or expenses for negligent performance. Specifically, that paragraph says:

> 6.2 LIMITATIONS OF LIABILITY
>
> Venture shall be liable for any losses, costs, damages and expenses incurred ... as a result of Venture's failure to perform its obligations hereunder ... Venture shall be liable for and indemnify Sallie Mae Servicing from, all damages caused by the negligence or wilful misconduct of Venture, its employees or agents.
>
> Because the insured had a legal obligation under the terms of its contract with Sallie Mae to remedy and correct any mistakes or errors in printing services, we conclude appellant's damages are sums that the insured incurred in correcting a mistake or deficiency in covered products or printing services. We also conclude that this insured was legally obligated to pay or incur the expenses necessary to remedy the misprinted books.

*Venture Encoding* is legally and factually distinguishable. Despite the claim arising out of a contract, there is nothing to indicate that the printer would have any reason or incentive to purposely print incorrect information on the coupon books; it bought coverage for printing errors and mistakes, and negligent performance. Thus the prophylactic rule against providing coverage for one's voluntary act of breaching a contract is inapplicable.

### Coverage for the "Excess":

 Plaintiff contends that it is only seeking coverage for the "excess" of that which it was legally obligated to pay McNamara under the Stock Purchase Agreement. This amount was based on a claim of corporate mismanagement by Defendant, and was therefore not encompassed within any breach of contract in which the Plaintiff may have been engaged. In so arguing, Plaintiff makes the following statement on pages 1–2 of its Memorandum in Opposition to Genesis' Motion for Summary Judgment (D.E.105):

> To prevent insurers from becoming surrogate guarantors on contracts, courts

have determined that an insured's non-payment of an actual contractual obligation is insufficient to satisfy the requisite "wrongful act" necessary to trigger insurance coverage. Genesis' authorities so state and WASTE CORP. does not take issue with the limited application of that principle.

This concession is fatal to Plaintiff's position. It concedes that contractual obligations cannot be covered, and by dropping its claims for the contractual amounts due DeStaven and Leon, and the alleged contractual amount due McNamara, it concedes that, as a factual matter, the policy here does not cover amounts due pursuant to a contract. Again, quoting Plaintiff, in its Motion for Summary Judgment (D.E.90) at Footnote Eleven, it states:

> There is thus a critical difference between the DeStaven and Leon settlements—which paid them amounts equal to what they were owed under the stock purchase agreement—and the McNamara settlement which far exceeded what he was otherwise due under the contract. This is precisely why WASTE CORP. is dropping its claims for the DeStaven and Leon settlements.

With Plaintiff's concession that contract amounts are not covered by the policy, the only remaining question is whether the so-called excess was contractual, or whether it constituted something other than contract damages. First, it bears note that all of McNamara's tort claims were dismissed by the court during the trial. The only claim that went to the jury was based on contract. The jury found for McNamara and against WCA in the amount of $3 million. That figure represented both royalty payments and earnout payments he claimed were due him under the stock purchase agreement. WCA then settled the claim for $2 million.

WCA's attempt to characterize the claim based on corporate mismanagement as being outside the Agreement must fail. The Agreement granted McNamara authority to "manage the day-to-day operations of the Companies as [a] reasonable prudent operator[ ]" and "take all actions that are usual and customary for [the Companies] to preserve [their] business and further [their] prospects as an ongoing enterprise." Stock Purchase Agreement, § 7.2.1. A perusal of Count II, the breach of third party beneficiary contract claim in McNamara's Third Amended Complaint (Ex. 11, Plaintiff's Appendix in support of its Motion for Summary Judgment) clearly discloses claims for royalty and earnout payments, and claims that WCA breached the Agreement by disallowing McNamara "from properly managing the day-to-day operations of the companies," and that WCA "perpetually managed the companies unreasonably and imprudently."

The mismanagement claims were thus clearly within the ambit of the breach of contract claims made by McNamara.

■ The fact that the amount awarded by the jury was not a liquidated sum does not remove it from the scope of what is permissible as a measure of damages in a breach of contract action. Contracts routinely require parties to undertake obligations without specifying a price for those obligations. Instead, in the event of a breach, expectation damages constitute the measure of value of the obligations. *See, e.g., Sharick v. Southeastern Univ.,* 780 So.2d 136 (Fla. 3d DCA 2000)("purpose of compensation for a breach of contract is to place the injured party in the position [it] would have been in had the breach not occurred"); *Qaddura v. Indo–European Foods, Inc.,* 141 S.W.3d 882, 888–90 (Tex. App.2004)(breach of contract damages protect party's "expectation, or benefit of the bargain, interest" and "restore the non-breaching party to the same economic position in which it would have been had the

**1362**

contract not been breached"). This is precisely what the jury in the underlying litigation found, and Plaintiff's efforts to recast the jury verdict by characterizing it as something other than damages based on breach of contract has no basis in law or fact. McNamara alleged, and the jury found, that WCA breached the stock purchase agreement by not allowing McNamara to manage the companies, and by its mismanagement of the companies, and awarded contract expectation damages accordingly.

It is therefore clear that the amount sought by WCA was not some amorphous "excess" over what the actual contractual damages were. The amount awarded to McNamara with within the factual and legal parameters of damages available and actually awarded for breach of the stock purchase agreement.

*Improper Settlement:*

Genesis also contends that WCA should be barred from recovery as a matter of law because it settled with McNamara without getting Genesis' permission, in violation of the insurance policy. Aside from the fact that this issue is fraught with factual questions which preclude entry of summary judgment, the issue is moot in light of the foregoing ruling.

Considering all of the above it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (**D.E. No. 96**) is **GRANTED**, and Plaintiff's Motion for Summary Judgment (**D.E. No. 90**) is **DENIED**.